William J. GRUTZMACHER, Plaintiff,

v.

PUBLIC BUILDING COMMISSION OF CHICAGO et al., Defendants,

PUBLIC BUILDING COMMISSION Counterclaimant,

v.

William J. GRUTZMACHER, Counterdefendant,

LUBAVITCH CHABAD HOUSE, INC., Plaintiff,

v.

The PUBLIC BUILDING COMMISSION OF CHICAGO, et al., Defendants.

Nos. 87 C 10746, 88 C 8708.

United States District Court, N.D. Illinois, E.D.

Nov. 23, 1988.

Supplemental Opinion Dec. 5, 1988.

Jennifer Craigmile Neubauer, Chicago, Ill., for William J. Grutzmacher.

Gary Sternberg, Sternberg & Assoc., P.C., Judd Azulay, Azulay & Azulay, P.C., Chicago, Ill., for Lubavitch Chabad House, Inc.

George N. Leighton, Earl L. Neal, Terence J. Moran, Sharon I. Tiller, Asst. Corp. Counsel, Chicago, Ill., for Public Bldg. Com'n of Chicago, et al.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

This case first came to this court through plaintiff Grutzmacher's request for an emergency order on the morning of December 22, 1987. The complaint was introduced during a hearing on the motion for a temporary restraining order. Apparently the plaintiff had been given permission to erect a creche on the Daley Center Plaza, but after it was erected employees of the defendant Public Building Commission began taking it down and would have completed dismantling and removing it but for intervention of members of the public who shielded what was left of it with their bodies. It appeared from the facts produced at the emergency hearing that the plaintiff had been granted leave to construct the creche on the Plaza but that afterwards the defendants notified or attempted to notify the plaintiff that they would need a $100,000 litigation bond for indemnification should they be sued for giving plaintiff permission to construct the creche. The same condition had been placed upon the parties who later filed the second case now before the court, Lubavitch, et al., who had in 1987 proposed to place a menorah on the Plaza and had posted the $100,000 cash bond.

This court, after listening to the parties before it last year, granted the temporary restraining order and directed the defendants to allow the plaintiff to restore the creche and permit it to remain on the Plaza until the day after Christmas. The parties in the *Grutzmacher* case thereafter proceeded to develop their litigation with discovery and pretrial motions throughout most of the subsequent year. By September of 1988 motions and cross-motions for summary judgment had been filed. But before either were ruled upon, plaintiffs were before the court requesting a preliminary injunction with relation to their new request for permission to place their creche on the Plaza for the approaching holiday season of 1988, the defendants having indicated a determination not to grant the request.

In the meantime the plaintiff in the second case, Lubavitch, discovered that the Public Building Commision had determined to not allow either the creche or the menorah to be displayed despite the fact that they, the Lubavitch plaintiffs, had been able to do so in the past. Lubavitch then brought its case, the second case entitled above, against the Public Building Commission, the City of Chicago and its mayor. In its prayer for relief, plaintiff asks for permission to display its menorah on the Daley Plaza and that defendants be temporarily and permanently enjoined from requiring a $100,000 cash bond. To this complaint the City of Chicago and its mayor had been joined as defendants to their case because in Count IV of their complaint they had asked also to be allowed to display the menorah at O'Hare Airport, property of the City which has not been deeded over to the Public Building Commission. This fourth count of the Lubavitch complaint will not be addressed in this decision because the court has severed off that portion of the controversies to cause it to be heard separately from the question of the displays at the Daley Center Plaza.

This second case was filed on October 13, 1988 and was assigned to another judge of this court. Eventually, through the application of local rules relative to related cases by the court's Executive Committee, the second case was transferred to be combined with the Grutzmacher case.

## I

The plaintiffs take the position that the Daley Plaza is a public forum within the meaning of the First Amendment, that the creche is a form of speech or expression, that the menorah is a form of speech or

expression, and that as such each is afforded First Amendment protection. This means then that government may not prohibit it and may only enforce content-neutral regulations of the time, place and manner with relation to the making of that expression.

Plaintiffs contend that based on the state of the law today in regards to First Amendment activities in public forums the defendant in the case of the creche in both dismantling it and presumably not allowing it to be displayed in the future violate the plaintiffs' First Amendment rights, the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. Section 1983. The same thing is true with relation to the imposition of large financial obligations for the use as had been required of the plaintiff Lubavitch.

The defendants have countered by arguing in motions to dismiss and for summary judgment that no federal right of either of the plaintiffs has been violated. The religious clauses, the defendants state, found within the First Amendment do not give the plaintiffs the right to erect any religious structures whatsoever in a public forum. This they say is mandated by that first clause of the First Amendment we refer to as the Establishment Clause. The defendants go on to say that because plaintiff Grutzmacher would not be able to comply with all of the requirements that would have to be requested by the commission, he would necessarily be on the Plaza unlawfully and would therefore be a trespasser.

Defendants also take the further position that the requests to display the particular religious symbols involved here, the menorah and the creche, should be denied because of the "adverse impact" such displays would have on members of the general public. It might briefly be stated here that this contention was supported only by speculative opinions of witnesses who evidenced personal biases and sought to support them with undocumented remarks they had heard from some people with whom they had talked. Their conversations with these third persons had not been part of usable research or statistical stud-

ies. In addition no logical connection existed between the subject matter of their speculations and the issues of fact and law involved in public forum cases. Defendants further take the position that they have stipulated that the Daley Plaza is a public forum, and that exploring the facts about the use of the Plaza would be superfluous. However, since what constitutes a public forum is a primary question of fact in this case, it turns out that the position defendants really take on this question causes their proffered stipulation to be of little or no assistance to the court in ruling on the differences between the parties.

## II

The initial question to be answered is what in fact and in law under First Amendment jurisprudence is a public forum. The guide to this is clearly given by the Supreme Court in its 1982 decision of *Perry Educ. Assn. v. Perry Local Educators' Assn.*:

> In places which by long tradition or by government fiat have been devoted to assemply and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parts which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' *Hague v. CIO,* 307 U.S. 496, 515 [59 S.Ct. 954, 963, 83 L.Ed. 1423] (1939). In these quintessential public forums, the government may not prohibit all communicate activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Carey v. Brown,* 447 U.S. 455, 461 [100 S.Ct. 2286, 2290, 65 L.Ed.2d 263] (1980). The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *United States Postal Service v.*

*Council of Greenburgh Civic Assns.,* 453 U.S. 114, 132 [101 S.Ct. 2676, 2686, 69 L.Ed.2d 517] (1981); *Consolidated Edison Co. v. Public Service Comm'n.,* 447 U.S. 530, 535–536 [100 S.Ct. 2326, 2332, 65 L.Ed.2d 319] (1980); *Grayned v. City of Rockford, supra,* [408 U.S. 104] at 115 [92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972)]; *Cantwell v. Connecticut,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213] (1940); *Schneider v. State,* 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155] (1939).

A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. *Widmar v. Vincent,* 454 U.S. 263 [102 S.Ct. 269, 70 L.Ed.2d 440] (1981) (university meeting facilities); *City of Madison Joint School District v. Wisconsin Employment Relations Comm'n.,* 429 U.S. 167 [97 S.Ct. 421, 50 L.Ed.2d 376] (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546 [95 S.Ct. 1239, 43 L.Ed.2d 448] (1975) (municipal theatre). Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. *Widmar v. Vincent, supra,* [454 U.S.] at 269–270 [102 S.Ct. at 279].

*Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45–6, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983).

Plaintiffs have given a thorough description of the usage to which the Daley Plaza was dedicated and has been permitted. In the complaint and briefs of plaintiff Grutzmacher, each item of the description has been attributed to either the deposition testimony or affidavits of officers of the defendant or to documents binding upon the defendant commission. I utilize freely language and statements from the pleadings and briefs of the plaintiffs in their two cases, ommitting as I go their item by item references to source material.

■ The facts show that it has become the custom and practice and usage of the defendant, Public Building Commission of Chicago, under color of law, to allow the Richard J. Daley Center Plaza to be used as an Open Public Forum, its having been the situs of numerous forms of use, cultural, musical, ethnic, military, religious, aesthetic, political, commercial, educational. It has involved the permissive engaging in many types of events, demonstrations, exhibits, celebrations and rallies.

The relatively new Daley Center, differing from the City Hall across the street, which, like many early 20th century governmental buildings is six double stories high and fills the whole of its city block from curb to curb except for doubled width side walks on all four sides, is a many story rectangular tower of steel and glass occuping only the north third of its city block. It houses a number of city administrative and county judicial functions, but the mayor's offices and the City Council are still across the street in the old City Hall. It looks down upon a wide and deep park like area artfully appointed with a large Piccaso expression in steel, an eternal flame, a large rectangular shallow pool crisscrossed with pipes of fountain sprays and several foliage areas with concrete benches about them. This park like wide open space call the Daley Center is flat and decoratively paved with squares of special sidewalk cement.

Since its construction in the 1960's the Daley Plaza has served its purpose of assuring the people of Chicago and their visiting guests that Chicago's government is a gentler and kindlier government than usually governments are expected to be. The Plaza has always been and obviously was intended to be a superior type of tradiitional public forum within the meaning of First Amendment jurisprudence. It manifestly was built to be a promenade and park for members of the general public. It

serves little functional purpose to the building gracing its northern portion the entrances to which approach the sidewalks from its narrower eastern and western sides. It has been the site of hundreds of speeches, rallies, demonstrations, protests, and exhibitions by individuals and organizations both public and private. Events taking place in the plaza include those that are political, educational, ethnic, cultural, commercial, controversial. For example, past events have included protests against human rights violations committed by the Soviet Union, by Yugoslavia and Viet Nam, protests of President Gorbachev's arrival in the United States, rallies communicating slain Hispanic activists, a bloody Nazi rally, ethnic musical programs five days a week during the summer, a Farmers Market on Saturdays during the summer, Mothers against drunk drivers rallies, an Amnesty International Candlelight Night, a Candlelight Vigil to prohibit discrimination against homosexuals, and a memorial service for the late Mayor Harold Washington.

The Commission has also allowed the erection of free-standing symbolic items and banners in the plaza as far back as 1970, indeed since the days of Richard Daley himself in his tenure as Mayor of Chicago for whom this plaza is named, and up through the present time the commission itself has allowed the simultaneous use of erections by both Christians and Jews.

The sukah is a Jewish religious symbol. It stands approximately 20 feet by 20 feet with an eight foot high hut, and a temporary house. It has remained on the plaza for periods up to eight consecutive days to commemorate the festival to which it relates. It has a sign on it saying, "Lunch With the Rabbis" posted on its side, according to the testimony of the secretary to the director of the commission.

 The Commission has also already allowed the erection of a 15 to 20 foot high menorah on the plaza to commemorate the Jewish Feast of Hanukkah. The menorah has been erected in mid-December and has remained on the plaza for approximately two weeks. In addition, it has allowed the city itself to place symbols there during the December holiday season. And with relation to the nativity scene of the plaintiff Grutzmacher, the Commission once considered it acceptable, though the Commission withdrew its consent before the actual showing of the exhibit, and recently has determined to ban from the Plaza all religious exhibitions during the December holiday season. The Commission must, but has failed to show that a compelling governmental need would be defeated by allowing an expressive activity such as the erection of the creche or the menorah on the Plaza. Plaintiffs two expressions here are forms of speech that are protected by the First Amendment. Here the Commission has failed to enunciate necessary State interest whatsoever for denying this use to either of these organizations, and, of course, to deny them such use merely because they are religious organizations seeking to make relgious expressions is discrimination in its rankest form. It goes against every grain of Americanism to see discrimination against anyone and especially against people because of their religions. This is particularly true where there is no evidence of a compelling state use which is injured by the public use.

The Supreme Court has consistently held that religious expressive conduct in a traditional public forum enjoys the same protections afforded political, artistic, or other types of protected speech under the First Amendment. *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). This principle has been repeated in the lower courts. *See Clergy and Laity Concerned v. Chicago Bd. of Ed.,* 586 F.Supp. 1408 (N.D.Ill.1984). Therefore, the responsibility of the Executive Director and the members of the Commission is to administer this public forum without discrimination against any persons who would use it regardless of their religion or regardless of their abstention from religion. This is a basic responsibility they must perform. Incidentally, it may never be effectively avoided by saying about one type of user as against the other, "It is easier for us to

administer the city's properties if no religionists come aboard. We would prefer not to have religionists of any type aboard our Daley Plaza." What a revolting and ridiculous position to be taken here in the United States of America and presumably under the mandate of our Constitution.

The Commission's fear of violating the Establishment Clause completely misses the point under the circumstances of this case. The Commission has shown no compelling interest to justify the prohibition of any religious holiday symbols on the plaza or to discriminate between one religion and another or to discriminate between all religionists and non-religionists. To say "none" is as repressive as it is unconstitutional. As stated by Justice Brennan in *McDaniel v. Paty:*

> Religionists, no less than members of any other groups, enjoy full measure of protection afforded speech association and political activity generally. The Establishment Clause properly understood is a shield against any attempt by government to inhibit religion ... It may not be used as a sword to justify repression of religion or its adherents from any aspect of public life.

*McDaniel v. Paty, et al.,* 435 U.S. 618, 641, 98 S.Ct. 1322, 1336, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring).

Finding as I must on the evidence of this case that the Commission has presented no compelling interest that would justify its prohibiting the erection of either the creche or the menorah as a form of free speech in the Daley Plaza a quintessential traditional public forum, any prohibition, purposeful, intentional, disguised, accidental or otherwise of either of the plaintiffs' two expressions on the Daley Plaza must be and the same is found to be unconstitutional and forbidden.

## III

In view of the foregoing I make at this time the following findings and conclusions:

First, this Court finds and declares that the Daley Plaza is a public forum, not only as a matter of fact but also as a matter of the First Amendment jurisprudence.

Second, the Court finds that the Public Building Commission is under law a separate municipal corporate entity with duties to the city to administer, manage, maintain, and supervise the use of specially deeded real properties of the city, including the Daley Plaza, exercising legislative, executive, quasi-judicial and administrative powers over such properties in all facets of their uses.

Third, the Court finds that the Commission under statutory, constitutional and decisional law is obligated to allow the free use of this Daley Plaza to members of the public, individual or institutional, private or corporate or otherwise, for the purpose of speaking to the public by words, by expressions or by symbols, without prior constrictions or restraints as to the content of their speaking or their expressions. There is but one type of limitation permitted it, and that relates to what may be necessary in the service of a compelling state interest. Such limitations would be included in procedural safeguards made necessary in the interest of safety, decency, and good order. No reliable evidence has been presented that would establish as a fact that the proposed expressions of the plaintiffs would trigger the need for such restraints.

Fourth, the Court finds from the facts and from the state of the law by which it is guided that religious discussions, symbols, art, music and other expressive activity in a traditional public forum all constitute speech within the context of the First Amendment to the Constitution of the United States, yet no more so than do secular, nonreligious, anti-religious, or merely informational words or expressions. They all should be regarded by the Commission and by its manner of dealing with them as equals under the law, each deserving to be afforded the same accommodation and the same protections in the use of the Daley Plaza. Each is expected, of course, to adhere to minimum schedules for use made necessary in the careful management of the plaza.

Fifth, the Court finds that the incidents giving rise to the controversies before it in the subject cases were the product of misunderstandings about facts and the law, the product of inadequacy of communications in both cases between plaintiffs and defendants, and the product of accidental failure on the part of the defendants to have had in place prior to those incidents a published policy or prescription relative to the use and management of the Daley Plaza as a public forum. Such policy or prescription would relate, of course, to the availability for open use of the forum by members of the public, whoever they may be. For example, all who wish to use it cannot be there at the same time. This requires management, and management naturally involves simple matters of time, place and manner, deadlines for application, communication regarding permits, preconditions for uses and the sharing of uses, matters about the size, the erection and removal of structures, the assumption of costs for utilities, and the protections of the plaza against the costs that could grow out of injuries to third parties caused by the uses themselves. These policies and procedures, of course, would contemplate the carrying out of conventional state purposes, but not the imposition of penalties or prices that serve no legitimate purpose or that serve only to discourage and restrain the use of the plaza or to insure the commission against its misperformance of responsibilities.

Both parties plaintiff in these consolidated cases ask for declaratory relief relative to their right to the use of the Daley Plaza. Both plaintiffs ask for compensatory and punitive damages, at least in nominal amounts, together with attorney's fees and court costs due to the incidents about which they complain and due to their experiences in seeking the use of the Daley Plaza during the annual general holiday season of last year. Both plaintiffs ask for injunctive relief with regard to the future use of the plaza, including restraint against the requirement of a bond, cash or otherwise, in the amount of $100,000 or any other amount, as a condition precedent to the issuance to them by the Commission of a permit for the use; and both plaintiffs in their cases ask the usual "such other relief as the court deems necessary" under the circumstances.

At the same time the defendants over and beyond the usual issue of right or wrong with relation to the incidents of December 1987, have doubtlessly awaited some determination by this court on their cross-motions for summary judgment. Under the circumstances, the court, while continuing to a later date the handling of other issues in these cases, but because the 1988 holiday season is almost upon us, has determined to rule forthwith on the requests of the plaintiffs for preliminary injunctive relief. Wherefore the court makes the following determination:

THE COURT PRELIMINARY ORDERS the defendants forthwith and until the Commission itself shall have enacted its own rules and regulations therefor

TO PROVIDE use of the Daley Plaza to applicants therefore, at their expense, without discrimination and without regard to the content of their expressions, religious or otherwise, and without the charging of fees or requiring the posting of bonds, on a first come first serve basis, for reasonable periods of time, but in a manner that will not create disorder or obstruct other general uses of the Plaza; and, in particular, to provide the same to the plaintiffs in these two causes for periods of up to fourteen days each during this 1988 holiday season.

## SUPPLEMENT OPINION RE: COUNT IV OF LUBAVITCH CASE

This matter is before the court on plaintiff Lubavitch's motion for a preliminary injunction as to Count IV of its complaint. The parties appeared and were heard on December 2, 1988 and in the evening of December 3, 1988. They presented evidence through the testimony of witnesses, and through exhibits, admissions, and stipulations. The issues were argued orally. The court makes the following makes the following observations, findings, and orders.

First, I find from all the evidence presented by both sides that the *Rules and Regulations Governing Protected First Amendment Activities* adopted by the O'Hare International Airport is a noble, and a magnificent, expression of government undertaken by it on behalf of the rights of all people to freedom of expression in a large, government operated, airport facility. Its statements read epigrammatically, and it could serve well as a model to be followed by similarly large municipally owned and operated, airports throughout the country. Its obvious purpose is speech that is uninhibited except by restraints which are are inescapably necessary to the success of an airport undertaking. The City of Chicago and its airport authority are to be commended.

Second, I find that in its benevolence it has gone far enough to provide for solicitation as a part of free speech and expression. The one exception it places as a limitation on speech relates to the erection of structures. Structures, by their very nature, cannot easily be monitored nor effectively located without their becoming obstructions to the primary people movement business of the airport. In this self regulation the defendant has voluntarily gone out front in the interests of those who would need an opportunity for religious expression. It has provided at its own expense what it calls a Non–Denominational Chapel in the use of which the three predominant faith groups in the Chicago area apparently have been invited to share. The Catholics have scheduled their sharing of this chapel on a regular, daily basis. The Protestants have chosen to share the use of it on Sundays. The Chicago Board of Rabbis apparently has yet not elected to subscribe to a predetermined use of it.

Third, I find the placement of Christmas trees, wreaths, and garlands by the airport authority itself in selected areas of the terminals, and the placement of decorations on and about them to fall well within the definitions of the Supreme Court of the United States, to be found in both the majority and minority opinions in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct.

1355, 79 L.Ed.2d 604 (1984), to be secular expressions of the "Christmas Holiday Season" as a universally recognized period of happiness, gentleness and kindness among people, and that the airport authority in this respect would not be in this matter in violation of the Establishment Clause of the First Amendment, were it not for the fact that much of the broadcast music with which it surrounds those expressions is clearly religious.

In view of these findings, I conclude that any pursuit of the petitioner's prayer for emergency relief during the seven or eight days of the 1988 Hanukah celebration, which already are upon us, must be at this time limited to the following:

A. That in broadcasting music in the proximity of the Christmas trees that have been erected in the airport, the defendant will cause to be substituted for recordings of strictly religious Christmas music, recordings of secular Christmas holiday music.

B. The court finding from the testimony of the witnesses and from the exhibits, that, except through the Authority's designated chaplain, a Catholic priest, no effort has been made to solicit representation of the Jewish faith to join with representatives of the Catholic and Protestant faiths, and to participate actively in the management and use of the facility designated a chapel, but that the time remaining to follow through in this matter is insufficient to permit a change in time for the present 1988 Holiday season.

Wherefore, I decline to enter an order with relation to this matter as a part of this preliminary mandatory injunction. I therefore set this matter over for further proceedings to be heard along with other matters in the subject case heretofore scheduled for hearing on January 9, 1989 at 10:00 a.m.