**Jane DOE, Plaintiff,**

v.

**George D. SMALL, et al., Defendants.**

**Ottawa Jaycees, Intervenor Defendants.**

**No. 88 C 6952.**

United States District Court,
N.D. Illinois, E.D.

Dec. 4, 1989.

---

Deborah Golden, Schiff, Hardin & Waite, Jane M. Whicher, Roger Baldwin Foundation of ACLU, Chicago, Ill., for plaintiff.

Michael Meyer and D.J. Sartorio, Tribler and Marwedel, Chicago, Ill., for City of Ottawa.

Cynthia Abbott, Patrick Lamb and Joel Chefitz, Katten Muchin & Zavis, Chicago, Ill., for Ottawa Jaycees.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Jane Doe[1] brings this action under 42 U.S.C. § 1983 ("Section 1983"), seeking declaratory and injunctive relief against the City of Ottawa, Illinois,[2] its Mayor George Small and certain City Council members (collectively "City Defendants"). Plaintiff challenges the display in a City park of 16 paintings depicting scenes from the life of Jesus Christ. Claiming responsibility for erecting, dismantling and storing the paintings, the Ottawa Jaycees ("Jaycees") intervened as an additional defendant. Plaintiff, City Defendants and Jaycees have all filed motions for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, this Court grants plaintiff's motion and denies defendants' motions.

### Facts[3]

Washington Park (the "Park") is owned by City and located on the northern edge of Ottawa's business district near the center of town. It is bordered on the north by Lafayette Street, on the south by Jackson Street, on the east by Columbus Street and on the west by LaSalle Street, one of the main arteries connecting the Ottawa business district with Interstate 80 north of town. Like most small parks, it is essentially an open city block covered with grass and a few trees. Although no buildings owned or used by City are visible from the Park, the Illinois Appellate Court for the Third District is directly across the street from the Park at the corner of Lafayette and Columbus Streets, and City Hall is three blocks away.

Around Christmastime in most years since 1956, a visitor to Ottawa traveling on LaSalle Street along the west side of the

---

1. Initially this action was brought by Richard Rohrer ("Rohrer") of Ottawa. On June 12, 1989 this Court granted leave to file a Second Amended Complaint striking Rohrer as plaintiff and substituting Jane Doe, also a resident of Ottawa.

2. Rather than use a single term for the City of Ottawa as both a corporate body and as a geographical location, this opinion will hereafter employ (1) "Ottawa" generally to refer to the geographical area within the city boundaries and (2) "City" more specifically to refer to the corporate entity and its governmental functions.

3. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*De-Valk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual perspective that sometimes causes the denial of both motions. In this case, however, the absence of any material factual issues eliminates the possibility of such a two-way denial.

Park would pass 16 paintings depicting events throughout the life of Jesus Christ. Arranged in two lines forming a wide-angle "V," the paintings span much of the length of the Park's west side.[4] Each painting is 8 feet 8 inches tall and is clearly visible from LaSalle Street both day and night.[5]

As a group, the paintings tell the story of Jesus' life as related in the four gospels of the New Testament—Matthew, Mark, Luke and John. Three paintings depict the events directly surrounding the birth of Jesus: the newborn Jesus, Mary and Joseph in the manger (Luke 2:7 [6]), God's announcement to the shepherds in the field of the birth of Jesus (Luke 2:8-20) and the Star of Bethlehem guiding the three wise men bearing gifts of gold, frankincense and myrrh to the birthplace (Matthew 2:1-12). Other biblical events depicted include the flight of Mary, Joseph and the baby Jesus into Egypt (Matthew 2:13-15), the baptism of Jesus by John the Baptist (Matthew 3:13-17; Mark 1:9-11; Luke 3:21-22; John 1:31-34), Jesus selecting two of his disciples (Matthew 4:18-22; Mark 1:16-20; Luke 5:1-11; John 1:35-42), Jesus miraculously stilling a storm (Matthew 8:18, 23-27; Mark 4:37-41; Luke 8:22-25), Jesus miraculously feeding 5,000 people on five loaves and two fish (Matthew 14:13-21; Mark 6:30-44; Luke 9:10-17; John 6:1-13), Jesus miraculously resurrecting Lazarus from the dead (John 11:38-44) and Jesus preaching (see Matthew 5:1-7:29—Sermon on the Mount). Finally, seven paintings depict the story of Jesus' death—the "Passion Narrative": Jesus triumphantly entering Jerusalem on Palm Sunday [7] (Matthew 21:1-9; Mark 11:1-10; Luke 19:28-38), the Last Supper (Matthew 26:17-29; Mark 14:12-25; Luke 22:7-20; 1 Corinthians 11:23-27), Jesus praying in the Garden of Gethsemane (Matthew 26:36-46; Mark 14:32-42; Luke 22:40-46), Jesus being tried before Pilate and convicted of heresy and treason (Matthew 27:11-26; Mark 15:1-15; Luke 23:2-25; John 18:28-19:16), Jesus crucified (Matthew 27:27-54; Mark 15:16-41; Luke 23:11-49; John 19:16-37) and the resurrected Jesus [8] revealing himself to two of his followers on the road to Emmaus (Luke 24:13-35).

There is considerable dispute over how long the paintings have been on display in recent years.[9] City Defendants claim to

---

**4.** Exactly how much of the west side of the Park the display spans and how much of the total area of the Park the display occupies are both sources of dispute. Jaycees offered the affidavit of Aimee Jonassen ("Jonassen"), which states "the distance from Lafayette Street to Jackson Street is approximately 366 feet" and "there are only 177 feet from the first Painting to the sixteenth Painting." Plaintiff moved to strike those assertions on the ground that the affidavit failed to establish (or even claim) that Jonassen has any personal knowledge of those matters or is competent to testify about them, for the affidavit failed to address whether, how or by whom any measurements were taken. But that objection on lack-of-foundation grounds (then responded to by a supplemental affidavit from Jonassen) has proved a kind of throwaway point that need not be considered, because it really makes no difference how the issue would be resolved. As for the total area of the Park taken up by the display, again the factual dispute seems to be more smoke than fire. Plaintiff claims the display occupies 20 percent of the Park, while Jaycees claim the figure is more like six percent. Apparently Jaycees use the term "occupies" to mean the actual airspace above the foundations taken up by the mass of the paintings, while plaintiff understands it to include more of the surrounding terrain. This Court need not determine which is the proper

definition of "occupies" nor the precise span of the display, because its constitutionality vel non turns on its overall purpose and effect, not on its exact measurements.

**5.** While the paintings are not themselves lighted, streetlights on LaSalle Street provide sufficient light to illuminate the paintings at night.

**6.** References to biblical stories are all to the New Testament, in the familiar format: Book (e.g., Matthew, Mark, Luke or John) chapter: verse(s).

**7.** Palm Sunday is celebrated today on the Sunday preceding Easter (see n. 8). In 1990 Palm Sunday will fall on April 8.

**8.** Easter is the traditional religious celebration of Jesus' resurrection. It is observed on the first Sunday after the full moon on or next after March 21, or one week later if the full moon falls on a Sunday. In 1990 Easter will fall on April 15.

**9.** There is also sharp disagreement over what years are relevant as to the length and content of the display. Jaycees argue this Court may look only to the year immediately preceding the current year, pointing to several cases in which

have no knowledge as to the dates or duration of the display for any year. Jaycees, on the other hand, have submitted these "approximate" dates of erection and dismantling: [10]

| Year | Erected (Approximate Date) | Dismantled (Approximate Date) |
|---|---|---|
| 1988 | November 27, 1988 | No later than January 1, 1989 |
| 1987 | November 29, 1987 | January 24–30, 1988 |
| 1986 | November 15, 1986 | Commenced January 1987 and ended February 21, 1987 [11] |
| 1985 | December 1, 1985 | February 2, 1986 |
| 1984 | December 2, 1984 | February 10, 1985 |
| 1983 | December 3, 1983 | March 4, 1984 |
| 1982 | December 4, 1982 | January 19 or 21, 1983 |
| 1981 | December 5, 1981 | January 10, 1982 |
| 1980 | December 8, 1980 | January 14, 1981 |

courts have focused on that year. Not so—as Justice O'Connor wrote in *County of Allegheny v. ACLU,* —— U.S. ——, 109 S.Ct. 3086, 3121, 106 L.Ed.2d 472 (1989):

> [T]he "history and ubiquity" of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion.

That point has special force when—as here—the most recent year is one in which defendants' long-established pattern of conduct has been materially altered in a single year under the threat of the current litigation. To be sure, parties are free to learn from the manner in which the law develops and to reshape their conduct to fit within the newly-clarified law (they are free even belatedly "to get religion," if a bad pun is permissible). *Mather v. Village of Mundelein,* 864 F.2d 1291, 1292 (7th Cir.1989) (per curiam) illustrates that. But where as here the most critical factor in the analysis—the content of the display—has not altered and remains so strongly religious and so nonsecular in its total message, Jaycees' contention loses its force entirely. Any makeweight added factors that City Defendants have introduced are just as ineffective in relation to the display's total effect and its legal result as the attempted mitigating disclaimers our Court of Appeals rejected in *American Jewish Congress v. City of Chicago,* 827 F.2d 120, 128 (7th Cir.1987). And that last-mentioned case also confirms the propriety of looking at the historical background of such a practice in evaluating its current constitutionality.

10. Each of the parties has caviled at instances of the opposition's claimed disregard of the Rule 56(e) requirement of admissible evidence on any Rule 56 motion. That always poses risks of the "people who live in glass houses shouldn't throw stones" variety, and Jaycees run afoul of that risk here. Their claimed support for the dates reflected in the following table is "Response 11 of Ottawa Jaycees' Supplemental Responses to Plaintiff's First Set of Interrogatories, attached as Exhibit 8 to the Appendix." But that set of interrogatory answers turns out to be supported only by this "affidavit" by Jonassen:

> I, Aimee Jonassen, being first duly sworn on oath, depose and state that I am the President of The Ottawa Jaycees, that I have read the foregoing Intervenor–Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories and that to my knowledge, information and belief, all facts contained therein are true.

That document is unfortunately symptomatic of today's too-prevalent carelessness in the preparation of affidavits (in a purely technical sense, for example, "facts" are always true by definition, and the affiant has not literally verified all *statements* in the document, so there is no telling exactly what she has and has not sworn to). More significantly, there is no way to tell from the attempted verification what items are based on Jonassen's "belief" rather than the required *knowledge.* In this instance, indeed, the interrogatory answer itself reflects that as to 1988 the "recollections of individual members, including Aimee Jonassen, differ"—and Jonassen's deposition makes it plain indeed that she does not have knowledge as to the purported facts set out in the table. It is well established that "statements made on belief or 'on information and belief' cannot be utilized on a summary judgment motion" (10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2738, at 489 & n. 38 and cases cited (2d ed. 1983 and 1989 pocket part)—and no less than the Supreme Court itself has confirmed that (*Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950)). Just as in *Automatic Radio,* then, "there is nothing available in the record to support the averment" (*id.*).

11. Jaycees say in their unsworn statement (see n. 10) that five paintings were removed in January 1987 but the remaining paintings were frozen; removal of the remaining paintings was assertedly completed February 21, 1987. Jaycees' own Chairman testified the paintings were not removed until February 21 or 28 (Stein Dep. 84–85).

According to Jaycees, they have historically erected the paintings as soon as possible after Thanksgiving and removed them again as soon after Christmas as the weather would allow. In those years in which the paintings remained on display long after Christmas, they say, the ground had frozen, making removal impractical until warmer weather ensued. They do not specify in which years such ground freezing prevented early removal, or in how many years that occurred.

Plaintiff rejects as implausible that explanation for the length of time the paintings remained on display, citing local climatological data for the 1983–84 through 1988–89 Christmas seasons—data that plaintiff argues disproves any suggestion that ground freezing explains the late-removal years. In addition, plaintiff directly refutes the 1988 removal date offered by Jaycees with "John Doe's" affidavit (P.Ex. 29) that he viewed the paintings on display in the Park as late as February 15, 1988.[12]

For the reason stated in n. 10, this Court has no hard evidence on the relevant dates in the years for which Jaycees offer their inadmissible approximations—except for 1988, as to which John Doe's sworn eyewitness recollection of the February 15 date is admissible evidence sought to be countered by an inference from the affidavit of Jaycees' Treasurer Tom Cawley. On the other hand, it is unnecessary to determine with precision the dates on which the paintings were actually removed or when the weather would permit removal. Even if Jaycees' proffered dates are assumed accurate, in every year since 1980 the paintings were displayed beyond (and in virtually every year, *well* beyond) any reasonable definition of the "Christmas season."[13] In addition, even if the claimed removal dates are assumed to reflect the first day in each year on which the ground thawed enough to allow removal of the paintings, defendants have failed to explain why no other action was taken to control the duration of the display, such as removing the paintings from their pipe legs or simply covering them up with a tarpaulin.

None of the parties claims to know who actually owns the paintings. In 1956 the Ottawa Retail Merchants' Association, in reaction to the increasing commercialism of the holiday, commissioned and first erected the paintings to "put Christ back into Christmas." *Someone* made sure the paintings were erected, taken down and stored every Christmas season from 1957 to 1969 and from 1980 to 1988. City Defendants admit City did so from 1963 to 1967, and Jaycees admit to having done so since 1980. In response to plaintiff's interrogatories, Jaycees say they "may" have erected the paintings from 1957 to 1962 and again in 1968 and 1969.

For several years in the 1970s the paintings were not displayed in the Park because of public criticism of the display.[14]

---

**12.** Plaintiff also invites this Court to assume that the paintings remained on display until March of every year since 1980 as a kind of sanction for "the lack of candid discovery responses" as to the length of the display. Plaintiff points to several changes in Jaycees' responses, particularly surrounding the 1987–88 Christmas season (apparently the only season for which plaintiff has her own independent source of information against which Jaycees' own responses—really unsworn (see n. 10)—can be tested). While this Court understands the frustration plaintiff must feel as Jaycees experience changes of heart (and changes of purported recollection) when faced with hard evidence that their earlier responses were incorrect, it must also be recognized that Jaycees were under no obligation to record meticulously the dates on which the paintings were removed, or to retain those records in case they someday might be questioned about them.

Even if this Court were to view Jaycees' behavior as sanctionable in nature, sanctions under Rule 37(b)(2) are available only to punish violations of discovery orders issued by this Court. No such order has been violated, and no such sanction is appropriate.

**13.** It can scarcely be viewed as coincidental that the *only* year in which Jaycees claim dismantling took place promptly after Christmas was the year *after* this lawsuit was filed. And of course no such late-found "reform" can control the result here.

**14.** Jaycees have moved to strike the newspaper articles offered by plaintiff relating to the history of the paintings. While it is true that this Court may consider only testimony that would be admissible at trial and that many of the statements contained in the challenged newspa-

In November 1980 the *Ottawa Daily Times* reported that City's Park Superintendent had discovered the paintings in the municipal storage area at the City-owned Riordon Pool. Then City Mayor James Thomas was quoted as hoping to find a private group willing to display the paintings and as promising "the City will pay the electrical bills for illuminating the paintings and help in any way we can, except financially, if a group wants to display them again." That same month Jaycees asked and received permission from City to take over the responsibility for displaying the paintings.

According to newspaper reports offered by plaintiff, City provided some of the labor necessary to erect the display during the 1980s. In 1986, in order to stop deterioration of the metal sleeves in which the paintings had been installed and to widen the angle of the display so "they could be more easily viewed by persons driving down LaSalle Street," City gave permission to Jaycees to install 32 permanent concrete foundations with holes to accommodate the pipes that form the legs on which the paintings stand. City Engineer William Krauss and then City Commissioner of Public Improvement George Small (now, in his capacity as Mayor, one of the City Defendants) met with Jaycees to discuss the construction of the foundations. Now the foundations remain covered year-round when the paintings are not on display.

Since the current lawsuit was first filed, both City and Jaycees have attempted to blunt the effects of the display by disclaiming City responsibility and diluting the religious message of the display. In 1988 Jaycees placed a sign next to the display reading: "THIS DISPLAY HAS BEEN ERECTED AND MAINTAINED SOLELY BY THE OTTAWA JAYCEES, A PRIVATE ORGANIZATION, WITHOUT THE USE OF PUBLIC FUNDS." Measuring 20½ inches by 21¼ inches and utilizing lettering 1¹⁄₁₆ inches high, that disclaimer is visible but not legible from across LaSalle Street. In addition, in the 1988 holiday season City began installing in the Park a 15-foot-tall lighted snowman and also began stringing lights, bows, snowflakes and giant candles on the trees in the Park and around town, a display dubbed "The Festival of Lights." City Defendants argue that those, along with other decorations in and around Ottawa (including a Santa Claus house that apparently alternates between the Park and the firehouse), provide alternative focal points for the viewer's attention and make the overall display secular.

### Applicability of Section 1983

■ Under Section 1983 a plaintiff has a remedy for any deprivation of rights, privileges or immunities secured by the Constitution or laws of the United States. Here plaintiff grounds her action on an asserted violation of the First Amendment's Establishment Clause ("Congress shall make no law respecting an establishment of religion"), which *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) confirmed as applicable to the States by virtue of the Fourteenth Amendment. Plaintiff's standing to bring this action derives from her uncontroverted testimony that while she normally enjoys using Washington Park, she avoids using the park when the paintings are on display.

per articles might appear at first glance to be double hearsay—(1) out-of-court statements by officials of City Defendants or Jaycees (2) later repeated by a reporter—two factors save them from Jaycees' motion. First, any statements made by officials of City Defendants or Jaycees are excluded from the definition of hearsay by Fed.R.Evid. 801(d)(2) as admissions of a party opponent. Once admitted against either City Defendants or Jaycees, these statements are then also admissible against the co-defendant because the gravamen of this Section 1983 action is that the conduct of Jaycees and City Defendants together constitutes state action impermissible under the Constitution. To para-

phrase *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961) in terms of this case:

> [City] has so far insinuated itself into a position of interdependence with [Jaycees] that it must be recognized as a joint participant in the challenged activity....

Second, the newspaper articles are accompanied by affidavits of their authors swearing that the statements related in the articles were true at the time written. Thus the articles themselves, authenticated and supplemented by the obviously admissible affidavits, qualify as recorded recollections under the hearsay exception in Fed.R. Evid. 803(5).

*ACLU v. City of St. Charles*, 794 F.2d 265, 267–69 (7th Cir.1986) held that a plaintiff's similar alteration in routine to avoid viewing a lighted cross on a fire station conferred standing on the plaintiff under Section 1983.

### Establishment Clause

■ Both sides in the current dispute ask this Court to perform the always difficult task of distilling from precedent a brightline rule of law to govern this case, a task made more difficult by the unsettled nature of the law in this area. Establishment Clause precedents provide less and less clear guidance to trial courts as the higher-court consensus on fundamental principles has become less and less common, with a corresponding proliferation of concurring and dissenting opinions. Any trial court must perforce exercise great care as it enters the thicket in search of a consistent set of principles to inform its Establishment Clause analysis.

Undoubtedly the first place to look for guidance (and, with its five separate opinions, a good view of just how full of thorns the thicket can be) is this year's *County of Allegheny v. ACLU*, —— U.S. ——, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), in which the Court looked at two displays of religious symbols on downtown Pittsburgh public property and held that one violated the Establishment Clause while the other did not. In reaching that result *Allegheny* reconfirmed the tripartite litmus test of *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) as to when a government practice violates the Establishment Clause. For a statute or government practice to pass that test (*id.*, citations omitted):

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, ...; finally, the statute must not foster "an excessive government entanglement with religion."

If the challenged display violates any one of those criteria, the display is unconstitutional (*Stone v. Graham*, 449 U.S. 39, 40–41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980) (per curiam)). Here plaintiff urges the paintings run afoul of not just one but each of the first *two* prongs.

#### 1. *Secular Purpose?*

In calling upon this Court to find that defendants acted with an impermissible purpose to endorse religion, plaintiff points to City Council Resolution R47–86 (P.Ex. 48), passed in response to complaints by Rohrer at the same meeting where Jaycees sought and received permission to display the paintings for the 1986–87 holiday season. That resolution reads:

> NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Ottawa, that after due consideration and reflection upon the complaint raised concerning the pictures in Washington Park, that this Council endorse the activities of the Ottawa Jaycees in maintaining, erecting, dismantling and storing said pictures and incorporating them in the overall Christmas display that annually graces the downtown area of the City and further thanks all the other groups, public and private, who also maintain, erect, dismantle and store other portions of the Christmas decorations which are integral to the annual Yuletide season and the spirit thereof.

Plaintiff argues the resolution shows City's purpose in allowing the display was to "endorse" the display and therefore the display's religious message.

Defendants assert several purported secular purposes behind City's allowing Jaycees to place the display in Washington Park. City Defendants argue their purpose was "to attempt to avoid or minimize the likelihood of litigation and to maintain the city's open forum policy" (D.R. Mem. 10). They point to the deposition of William Ferguson, the Mayor pro-tem at the time, in which he testified that City initially passed a resolution denying Jaycees' request to display the paintings for the 1988–89 Christmas season in order to avoid a suit by Rohrer. According to City Defendants' current litigation contention (D.R. Mem. 9), it was only when City learned that such a denial might open City up to suit by Jay-

cees for denial of Jaycees' right to freedom of expression that City reversed its earlier denial, thereby returning to its open-access policy.

City Defendants' argument grossly mischaracterizes Ferguson's testimony, which is attached to this opinion as Appendix A.[15] First, to counter plaintiff's claim that the purpose behind Resolution R47–86 was to endorse the display, City Defendants offer Ferguson's testimony as "the history of the resolution" (D.R. Mem. 9). That assertion is incomprehensible in light of the fact that the subject of Ferguson's testimony—the October 18, 1988 resolution denying Jaycees' request to display the paintings and the subsequent reversal of that decision—took place two years *after* R47–86 was passed. More importantly, in response to a question by plaintiff's counsel asking him to explain the motivation behind rescinding the City's prohibition on the erection of the paintings during 1988–89, Ferguson did indeed state that "either way, we were going to have litigation" (Ferguson Dep. 123–24). But it is crystal clear from reading Ferguson's testimony that by "either way" he was not at all suggesting that he understood that *Jaycees* might sue for breach of their right of free speech, and nowhere did he refer to an asserted "public forum" policy.[16] Rather his expressed concern was that future City Councils would face the same prospect of litigation from *Rohrer*, because Ferguson understood Rohrer to be demanding a perpetual ban on the display. In essence, the City Council was unwilling to agree to a permanent ban on the paintings,[17] and it knew that agreeing to ban them in 1988 would not insulate them from further litigation by Rohrer in 1989 and beyond.

But even if City Defendants' current argument had been supported by Ferguson's testimony (as it plainly is not), it would fail to provide a secular purpose for allowing the display. First, the asserted justification for City's allowing the display during the 1988–89 season fails to explain City's purpose in allowing the display in earlier or later years. In addition, even assuming City feared litigation by both Rohrer and Jaycees in 1988 and after, City's desire to avoid a lawsuit cannot explain why City decided to allow Jaycees to erect the display and make Rohrer sue, rather than appeasing Rohrer (and, not incidentally, satisfying the First Amendment) and making Jaycees sue. Furthermore, if the Establishment Clause were to allow City to claim that its purpose in making or endorsing a religious message is to avoid being sued by a private party attempting to force City to make or endorse that message, "any religious activity of whatever nature could be justified by public officials on the basis that the activity has beneficial secular purposes" (*DeSpain v. DeKalb County Community School District 428*, 384 F.2d 836, 839 (7th Cir.1967)).

Jaycees suggest two other purposes behind City's action. First, they contend City merely wanted to recognize "that the Paintings epitomize Christmas in the hearts and minds of Ottawa's citizens" (J. Mem. Opp. 26), reflecting a permissible accommodation of the community's religious sentiments. While Jaycees correctly point out that our Court of Appeals in *American Jewish Congress*, 827 F.2d at 127 held that Chicago's erection of a nativity scene in

---

**15.** It is disturbing to note that the pages from the Ferguson deposition that City Defendants cite in support of their asserted secular purpose not only fail to suggest any such purpose, but that those pages were not included among the deposition excerpts supplied to this Court until specifically requested by its law clerk. City Defendants' counsel must unfortunately be viewed as disingenuous in having advanced this aspect of their argument at all.

**16.** Indeed, it would be surprising if City had in fact acted to promote the now-asserted open forum policy. City Defendants admit City has

never formally stated any such policy, and nothing in its conduct really supports the notion that any such concept was at work here. Once more City Defendants cannot be heard to fabricate "facts" out of whole cloth, shaped to fit what they now perceive to be demanded by this lawsuit.

**17.** Ferguson's testimony (Dep. 122) also suggests the City Council believed itself powerless to bind future City Councils to such a ban. Whether true or not, that certainly does not provide a secular purpose for allowing the display in any given year.

City Hall had as a constitutionally permissible purpose the accommodation of religion by "symboliz[ing] the 'true meaning of Christmas' for hundreds of thousands of Christian Chicagoans," the more recent—and of course controlling—Supreme Court decision in *Allegheny*, 109 S.Ct. at 3105 n. 51 (citations omitted) rejects such an application of the concept of accommodation:

> Nor can the display of the creche be justified as an "accommodation" of religion.... Government efforts to accommodate religion are permissible when they remove burdens on the free exercise of religion.... The display of a creche in a courthouse does not remove any burden on the free exercise of Christianity. Christians remain free to display creches in their homes and churches. To be sure, prohibiting the display of a creche in the courthouse deprives Christians of the satisfaction of seeing the government adopt their religious message as their own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes.[18]

Second, Jaycees argue City decided to allow the paintings as part of a larger effort by public and private parties to decorate the downtown shopping area to encourage visitors to Ottawa to increase shopping and the transaction of business. *ACLU v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098, 1111 (11th Cir.1983) (per curiam), quoting *School District of Abington Township v. Schempp*, 374 U.S. 203, 294, 83 S.Ct. 1560, 1609, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring), addressed and rejected precisely that contention when advanced to justify a latin cross constructed atop the local fire station, defended as a means of promoting tourism:

Although the promotion of tourism is a secular goal commonly pursued by states, cities and counties alike, a government may not "employ religious means to reach a secular goal unless secular means are wholly unavailing."

And for the same reason, *Gilfillan v. City of Philadelphia*, 637 F.2d 924, 930 (3d Cir. 1980) rejected Philadelphia's argument that constructing a platform containing a 36-foot-tall cross for use by the Pope during his visit to the city had the secular purpose of improving public relations. This is not to say a city may never assert the promotion of tourism or shopping as a secular purpose. Rather the cases teach that no court is compelled blindly to accept such an explanation as a city's true purposes, where the same goal could have been achieved without using such obviously religious symbols as the latin cross or, as in the per curiam opinion in *Stone*, 449 U.S. at 41–42, 101 S.Ct. at 193–94, the Ten Commandments.

Here City chose to celebrate Christmas—the event linked to the *birth* of Christ [19]—by displaying sixteen paintings depicting the major events in Jesus' *entire life*. Only three of the sixteen paintings portray events directly related to Christ's birth, while the remainder graphically depict the events—including the miracles—that form the core of Christian belief and doctrine. Only one reasonable inference flows from City's decision to allow this blatantly religious display on public property instead of other more secular displays: City intended to promote that religious message, for no secular message may fairly be attributed to the display in its totality. As Justice Blackmun wrote in *Allegheny*, 109 S.Ct. at 3114:

> Where the government's secular message can be conveyed by two symbols,

**18.** [Footnote by this Court] Although *Allegheny* involved a splintered Court, this quotation comes from Part IV of Justice Blackmun's opinion—a portion of his writing for the Court as a whole.

**19.** What the cases teach is that the commemoration of that event, though initially rooted in its purely religious origin (as a *holy* day), has come to have a predominantly secular significance today (as a *holi* day)—and that evolution has occurred in substantial part because of the commercialization that has grown up around it (and that, it may be observed, is often decried by religious leaders as a development blurring what ought to be the real focus of the holiday). But no such body of case law has thus converted Palm Sunday or Easter, for example, to such secular holidays (see n. 20).

only one of which carries religious meaning, an observer reasonably might infer from the fact that the government has chosen to use the religious symbol that the government means to promote religious faith.

Because the sole purpose behind the display of the intensely religious paintings was to promote their religious message, City Defendants violated the Establishment Clause by allowing Jaycees to construct and maintain the paintings in the Park.

### 2. Nonreligious Effect?

■ Even if this Court were not to find City acted with an impermissible purpose (an impermissible finding, as just demonstrated), the display would still be clearly unconstitutional because its overall effect is obviously to endorse the Christian religion. Again the analysis draws profitably on this year's teaching from the Supreme Court.

*Allegheny* found unconstitutional a creche displayed on the grand staircase inside the Allegheny County Courthouse, at the same time that it upheld as constitutional a display outside the City–County Building comprising an 18–foot Chanukah menorah, a 45–foot decorated Christmas tree and a sign declaring the display to be a "salute to liberty." While the Justices were unable to agree on a single formulation of the effect test and have eschewed any "fixed, per se rule" (*Allegheny*, 109 S.Ct. at 3117 (O'Connor, J.), quoting *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)), Justice Blackmun's opinion spoke for the Court in saying in *Allegheny*, 109 S.Ct. at 3101:

Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community." *Lynch v. Donnelly*, 465 U.S. at 687, 104 S.Ct. at 1366 (O'Connor, J., concurring).

In surveying past cases applying that endorsement test, the majority opinion further elaborated (*id.*) (citations omitted, emphasis in original):

[I]t has been noted that the prohibition against governmental endorsement of religion "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred.*" ... Moreover, the term "endorsement" is closely linked to the term "promotion," ... and this Court long since has held that government "may not ... promote one religion or religious theory against another or even against the militant opposite."

*Allegheny* evaluated the challenged displays in terms of both the content of their messages and the context in which the messages were presented to determine their overall effect.

As to the creche, the Court found that its message was at least partly religious, and that the religious message was not negated by surrounding it with floral decorations or by placing secular Christmas decorations elsewhere in the Courthouse. Nor did placement of a sign stating "This Display Donated by the Holy Name Society" sufficiently disclaim County endorsement of the religious message to make the overall effect secular. Instead, the floral display merely formed a frame around the creche that, "like all good frames, serves only to draw one's attention to the message inside the frame" (*id.* 109 S.Ct. at 3104), and the sign simply clarified that the County was endorsing someone else's message, not making one of its own.

Unlike the creche, the menorah "present[ed] a closer constitutional question" (*id.* at 3111–12 (Blackmun, J.)) and produced more mixed signals from the Court. In fact, four of the votes for upholding the menorah came from Justices applying a test rejected by the majority of the Court. They argued that the display should be upheld unless its overall effect is "coercive" or "proselytizing" (*id.* at 3134–37 (Kennedy, J.)). Only two Justices applying the majority "endorsement" test failed to find that the menorah was also an endorsement.

Those who did, however, focused on the secularizing effect of the Christmas tree and the sign displayed alongside the menorah. In Justice Blackmun's view the overall effect of the display was to commemorate the secular aspects of the Chanukah–Christmas season. In Justice O'Connor's somewhat different view, the display commemorated liberty and the freedom to believe as one chooses.

Many factual variants, other than the situation presented by the present case, would present real difficulties in picking a line out of the varied perspectives of the Justices in *Allegheny*. Here however no such troublesome reconciliation is needed—for it cannot be gainsaid that the primary effect of the currently challenged paintings is clearly to endorse the Christian religion. As already detailed, the content of the display includes many of the events central to Christian teaching and religious doctrine. Included are the miracles that Christian teaching says prove the divinity of Jesus Christ and call for his worship. Thirteen of the paintings have no relation to the Christmas holiday beyond the commonality of the starring character, and seven relate directly to the exclusively religious Easter holiday season.[20]

Neither does the context in which the paintings are displayed detract from their religious message. Like the floral displays surrounding the *Allegheny* creche, the "Festival of Lights" simply serves to draw attention to the Park and enhances the effect of the paintings' religious message. Unlike the Christmas tree and sign proclaiming liberty that accompanied the menorah, neither the lights nor the 15–foot snowman suggest any secular theme into which the paintings fit.

This case is nothing like *Lynch*, in which the symbol with religious significance—a creche—was part of a single large display of otherwise secular items (465 U.S. at 671, 104 S.Ct. at 1358):

> including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, [and] a large banner that reads "SEASONS GREETINGS."

It is abundantly clear from the photographs offered by plaintiff that the snowman, which stands behind the paintings and faces to the north while the paintings face west, is not part of a single display with the paintings and does nothing to "secularize" the paintings. For the same reason, the current case is totally distinguishable from *Mather*, in which our Court of Appeals upheld the display on the city hall lawn of a creche along with lighted evergreens, carriage lights, wreaths, banners, a Santa Claus and sleigh, carolers, snowmen and two soldiers in the shape of nutcrackers.

While the discussion to this point demonstrates that the challenged display would be unconstitutional regardless of the length of time the paintings remained on display, the unconstitutionality of the display is further confirmed by City's past willingness to allow the display to remain far beyond any reasonable definition of the Christmas season. By mid- to late- January—let alone by March—a visitor exposed to the religious display in City's Park

---

20. Defendants suggest that depiction of all events in the life of Jesus is an appropriate method of commemorating the Christmas holiday, just as Washington's birthday may be commemorated by remembering his cutting down the proverbial cherry tree, or the birthday of Martin Luther King, Jr. by quoting his sermons. That attempted appeal to false analogies ignores the special nature of Christmas as a national holiday. While the Washington and King birthdays are exclusively secular holidays, Christmas has both secular and religious aspects. As *Allegheny*, 109 S.Ct. at 3105 said:

> The government may acknowledge Christmas as a cultural phenomenon, but under the First Amendment it may not observe it as a Christian holy day by suggesting that people praise God for the birth of Jesus.

Government may not, consistent with the Establishment Clause, celebrate Christmas as a secular holiday by highlighting its exclusively religious connotations. Neither could government (to bring the false analogies closer to truth) celebrate Washington's birthday by encouraging people to worship him as a deity or celebrate King's birthday by encouraging people to join the church in which King preached.

would conclude that City endorsed it as a religious message rather than as a celebration of a secular holiday nearly a month past.[21]

### Public Forum

█ Finally, it makes no difference to the analysis or result that Washington Park may be a public forum. Defendants argue the First Amendment's Free Speech Clause gives Jaycees, as a private organization, the constitutional right to express its religious beliefs in Washington Park. In their view, not only is City not required to limit or prohibit their display, but the First Amendment prohibits any such regulation. Defendants insist Jaycees' right to use the public forum may be abridged only if the state finds it necessary "in the interests of safety, decency, and good order" (D. Mem. 7, citing *Grutzmacher v. Public Building Commission of Chicago*, 700 F.Supp. 1497 (N.D.Ill.1988)).

Plaintiff challenges that attempted characterization of the Park as a public forum on the ground that it is actually used as a forum by relatively few individuals or organizations. While this Court recognizes that a city park is generally considered the quintessential public forum, which (as it was put in *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)) has:

> immemorially been held in trust for the use of the public and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions,

it is unnecessary to decide here whether the Park may lose its status as a public forum through desuetude. Even on the premise that the Park may be considered a public forum, *Widmar v. Vincent*, 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) teaches that the state may regulate or exclude a speaker because of the content of his speech if the state can "show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar, id.*

at 271, 102 S.Ct. at 275 goes on to say that the state has a compelling interest in complying with its constitutional obligation not to violate the First Amendment's Establishment Clause. Thus City Defendants may—and must—regulate religious speech in Washington Park, including that of Jaycees, if such speech presents the danger of a violation of the Establishment Clause. As *Allegheny*, 109 S.Ct. at 3105 said:

> [T]he Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communications by religious organizations.

This opinion has already demonstrated at length that the challenged display has the constitutionally impermissible purpose and effect of endorsing religion. Furthermore, the situation here is dramatically different from *Widmar*, in which there was a clear perception that the use of university classrooms by student religious groups resulted from an established policy whose benefits inured to a diverse class of religious and nonreligious groups alike, and was understood by the public and students alike as neutrality on the part of the university. Here Jaycees are the *only* group that has regularly taken advantage of the forum for an expressive activity of any length. Other private uses of the park—an annual flea market, occasional church services and political speeches—do not result in the same kind of sustained statement of a message and do not similarly associate City with the messages (if any) expressed by the other speakers. Unlike *Widmar*, here there is unrefuted "empirical evidence that religious groups will dominate [the] open forum" (454 U.S. at 275, 102 S.Ct. at 277), for Jaycees' religious display has dominated the Park, with a few interruptions, for over 30 years.

### Conclusion

Because Jaycees' display of paintings depicting the life of Jesus Christ in the Park

---

**21.** It will soon be time for the onset of pre-Christmas music—including the familiar "Twelve Days of Christmas." Even if that expanded version is substituted for Christmas Day—December 25—Jaycees' purported evidence of the claimed dismantling dates (even if accepted, but see n. 10) never approached the outside limit of the "Twelve Days" except for the litigation-stimulated response of 1988–89.

has both the primary purpose and primary effect of endorsing an overtly religious message, the display doubly violates the Establishment Clause of the First Amendment to the Constitution. This Court has been advised that the paintings have already been put up on display for the current season.[22] City is therefore ordered to have the paintings removed by December 8, 1989 and to forgo any future display of the paintings in the Park by any group.[23]

## APPENDIX A

### WILLIAM FERGUSON DEPOSITION

A. I don't believe so.

Q. Did they act on it at a meeting at the City Council?

A. I don't recall so.

Q. On October 18th of 1988, the City Council denied permission for the erection of the paintings that depict the life of Christ in Washington Park, didn't it?

MR. SARTORIO: Objection to characterization.

THE WITNESS: I believe sometime during that period, yes.

BY MS. GOLDEN:

Q. And then shortly thereafter, indeed, ten days later, that resolution was first, wasn't it?

A. I believe so.

Q. Why did the City Council reverse its original decision not to permit the paintings to be erected?

A. I believe it was quite obvious that the demands of Mr. Rohrer would not be met prior to the first Council action and we could not avoid litigation, and it was, therefore, we reversed our thinking on it.

Q. At the meeting when the City Council voted to permit the display of the paintings and rescind its prohibition against the erection of the paintings, Mr. Hupp appeared, did he not?

A. He came to many meetings, I believe.

Q. And didn't he introduce Mr. Robert Skolrood of the National Legal Foundation at that time?

A. Yes.

Q. Did Mr. Hupp and Mr. Skolrood discuss the defense of the lawsuits?

A. Yes.

Q. And Mr. Skolrood stated that the National Legal Foundation would commit $100,000 to the case and would file an intervening petition on behalf of the Ottawa Jaycees only if the city continues the defense of the lawsuit?

A. Yes.

Q. Didn't your attorney, Mr. John Hayner, reiterate his recommendations to the Council from prior meetings stating that

---

**22.** This Court sought to telephone counsel for all parties on the day after Thanksgiving (November 24) to advise them of the imminent issuance of this opinion and to suggest that defendants defer erecting the display for a short period until they learned the nature of this Court's ruling on the issues. It proved impossible to reach the lawyers because they (perhaps more sensibly than this Court) were taking advantage of the Thanksgiving holiday to create a four-day weekend. When this Court did reach counsel (via a conference call Monday, November 27), it learned the display had just been erected over the weekend. Of course the pendency of this lawsuit, with the parties' awareness that this Court had compelled their expedited treatment of the discovery and briefing to permit a timely decision, gives defendants no vested interest in the newly-reconstituted display. In conventional status quo terms, this Court's order compelling the paintings' removal must

be perceived as restoring rather than altering the status quo.

**23.** Plaintiff's request for relief sought the imposition of reasonable restrictions on the time, place and manner of displaying the paintings in the Park. Of course this Court has the power to fashion any remedy that meets standards of fairness and equity (*Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971)). This Court finds that the unmistakably religious content of the paintings as a group moots any time-and-manner restriction as a saving device. Moreover, the Article III prohibition of judicial advisory opinions renders unseemly any volunteered expression by this Court as to how much less activity involving the same materials (or part of them) might conceivably pass muster under the Establishment Clause.

finances, no reasonable chance of winning, and alternative sites were the major factors in his recommendations that the city prohibits the paintings from being erected?

MR. SARTORIO: Objection.

THE WITNESS: Yes.

BY MS. GOLDEN:

Q. So why did the City Council rescind its prohibition on the erection of paintings in Washington Park?

A. That Mr. Rohrer wanted to go more than one year, and he wanted financial recuperation, and he had other demands, and there was no way that we could be bound to do that for other council, therefore, we reversed ourselves.

Q. When you say Mr. Rohrer wanted to go more than one year, are you referring to the fact that Mr. Rohrer sought to prohibit the display of the paintings on a permanent basis?

A. Yes.

Q. And why was the City Council adverse to that particular request?

A. We felt we could not make that type of judgment and bind the city and the rest of the new councils, which was prior to taking into office at that time.

Q. Anything else?

A. No.

Q. And why was the City Council unable to make that judgment?

A. I don't know.

Q. Who would know?

A. I don't know.

Q. In addition to what you said that Mr. Rohrer's other demands was a factor in the City Council's decision to rescind its prohibition concerning the erection of the paintings in Washington Park, what were those other demands?

A. I hate to bring this up; attorneys fees.

Q. Anything else?

A. I don't recall.

Q. Were there any other factors, other than what you've testified about here to-day, which entered into the City Council's decision to rescind its prohibition on the erection of the paintings?

A. Only we could not avoid litigation. If we—either way, we were going to have litigation, so that would be it.

Q. I'm not sure what you mean.

A. In other words, we went for one year to avoid litigation and costly expenses on both parts, and it was quite obvious, when he came back with all of these demands, we could not avoid it, therefore, we reversed ourselves.

Q. Did the National Legal Foundation commit $100,000 to this case?

A. They said they did.

Q. Have you ever seen any documents reflecting that commitment?

A. No.

MR. SARTORIO: Are you talking about commitment to the Jaycees?

MS. GOLDEN: It's a commitment to the case.

THE WITNESS: No.

BY MS. GOLDEN:

Q. Did the city receive any portion of that $100,000 in connection with the defense of this lawsuit?

A. No.

Q. Who is Ario Franzetti?