**Wanda R. LEE, PLaintiff–Appellant,**

v.

**The NATIONAL LIFE ASSURANCE COMPANY OF CANADA, Defendant–Appellee.**

No. 79–2473.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1980.

Rehearing Denied Jan. 30, 1981.
See 635 F.2d 516.

Alvin Boyd, Dallas, Tex., for plaintiff–appellant.

Thompson & Knight, John A. Mackintosh, Jr., O. Paul Corley, Jr., Dallas, Tex., for defendant–appellee.

Before THORNBERRY, GEE and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

This is a life insurance case wherein the company denied liability, claiming that the insured had falsely represented that he had not suffered a heart attack or any other symptoms of heart disorder prior to the time of his application for insurance. The insured died of a heart attack approximately four months after the company issued him a policy which named his wife as bene-

ficiary. She brought this diversity suit seeking damages consisting of the amount of the policy ($50,000), a 12% penalty on the amount of the policy for failure to make prompt settlement as authorized by Tex. Ins.Code Ann. art. 3.62 (Vernon 1963), and reasonable attorney's fees. She now appeals from an order of the district court that granted summary judgment in favor of the insurance company on the ground that the company established all the elements of a misrepresentation defense as a matter of law. We reverse.

## I.

In February or March of 1977, Roger H. Lee, Jr. applied for life insurance coverage with the National Life Assurance Company of Canada in conjunction with obtaining a small business loan. In connection with the application, Lee submitted to an interview with a medical examiner, who was employed by an office which conducted physical examinations for life insurance companies. During this interview, Lee answered certain questions concerning his prior health history, and the answers to these questions are shown on the application for insurance, which was thereafter attached to the policy when it was issued.

The application form filled out during the medical examination reflects that Lee responded in answer to question 1(a) that he had no personal physician. In answer to question 2(c), the application indicates he responded that he had never been treated for or ever had any known indication of bronchitis or chronic respiratory disorder. The application shows that for question 2(d) he answered that he had never been treated for and had never had any known indication of chest pain, high blood pressure, heart murmur, heart attack or other disorder of the heart or blood vessels. In answer to question 5(a), the form shows that he had not had any mental or physical disorder, other than as disclosed by his previous answers, within the preceding five years. The form also indicates that Lee stated in response to question 5(b) that he had not, within the preceding five years, had a check

up, consultation, illness, injury or surgery. In addition, the form reflects that Lee answered question 5(c) to the effect that he had not been a patient in a hospital, clinic, sanitarium, or other medical facility within the preceding five years. The application does show that, in answer to question 5(d), Lee indicated he had received an electrocardiogram within the preceding five years; specifically, the form reflects that Lee had an EKG with negative results and details unknown in 1970. The summary judgment evidence reveals that the true facts did not comport with the answers stated in the application.

The summary judgment evidence before the district court establishes that Dr. Jewell had been Lee's personal physician since July of 1972, when Lee was hospitalized complaining about chest pain. Because Lee complained of chest pain, an electrocardiogram was taken which demonstrated that Lee had suffered a mild myocardial infarction. Lee was then admitted to the coronary care unit of the hospital. Dr. Jewell testified by deposition that he performed a physical examination upon Lee during this hospitalization and reached a diagnosis that in all reasonable medical probability Lee had suffered an acute "inferior myocardial infarction with third degree atrial ventricular block with a nodal rhythm." Dr. Jewell advised Lee that he had suffered a heart attack during his hospitalization.

The plaintiff in her deposition testified she was aware in 1972 that her husband had heart problems, because the doctor had told her that her husband had suffered a coronary, which she understood to mean a heart attack.

Dr. Jewell further testified that he saw Lee on numerous occasions after the heart attack in 1972. The doctor stated that x-rays revealed Lee's heart was enlarged, and nitroglycerin was prescribed because of Lee's continuing complaints of chest pain. In July of 1973, Dr. Jewell saw Lee at the Irving Community Hospital when Lee was complaining of chest pain, which Dr. Jewell suspected was caused by bronchial pneumonia.

In April of 1975, Lee again complained of chest pain, and Dr. Jewell ordered an EKG which revealed changes of the old inferior myocardial infarction. In May of that year, Dr. Jewell again hospitalized Lee because of chest pain. The doctor prescribed medications to reduce the work of the heart muscle and to decrease the chest pain. Another EKG was taken during this hospitalization. Dr. Jewell testified that Lee had an abnormal EKG stress test which implied that the circulation of blood to the heart through the coronary arteries was insufficient to give a normal test. When Lee was discharged from the hospital, Dr. Jewell advised him that he had arteriosclerotic heart disease.

From the time of this last hospitalization in May of 1975 to the time when Lee applied for insurance in February or March of 1977, Dr. Jewell saw Lee on three occasions. Thereafter, Dr. Jewell saw Lee in May of 1977 when Lee was complaining about discomfort in his chest upon exertion, which he told the doctor had occurred ever since he had his heart attack in 1972. Dr. Jewell again saw Lee on June 21, 1977 concerning complaints about chest pain, occurring two to three times per week which was relieved by nitroglycerin. Lee died at home on July 31, 1977. Dr. Jewell signed the death certificate, which stated that the immediate cause of death was "myocardial infarction" (heart attack).

In opposition to the motion for summary judgment, plaintiff submitted the affidavit of Joni Duignan, the medical examiner who interviewed Lee when he applied for life insurance. Duignan stated that her job was to assist the doctor in physical examinations for life insurance. In addition to her other duties, which included office work, preparing and mailing urine and blood specimens, and taking x–rays, she interviewed on the average between 10 and 15 applicants for life insurance each day. She indicated these interviews were sandwiched in with all her other duties. There were often interruptions, either by telephone or by other business in the office. The office for which she worked conducted examinations of insurance applicants for 40 to 50 insurance companies, each of which used a different form. During the course of an interview, she would ask questions based on each insurance company's form, and the applicant would provide her with the information. Significantly, Duignan stated:

"The answer of the applicant was not the answer I put down on the form. Usually the applicant's answer was general and informative, and from the information he or she gave me I had to decide how the question should be answered. Generally, I tried to answer the question in favor of the applicant obtaining insurance because the insurance companies wanted to sell the insurance and they did not like it when we found something wrong. In addition, the nature of the questions required an exercise of judgment, and I used my best judgment in writing the answers to the questions based upon the general information the applicant gave me."

Also in the affidavit, Duignan stated that she had been shown a copy of the application attached to the life insurance policy issued to Lee by the National Life Assurance Company. She said that the application consisted of two pages on a single sheet of paper and that the handwriting appearing on the page bearing her signature was hers, with the exception of Lee's signature.[1]

---

1. The insurance application consisted of two parts. According to the testimony of the plaintiff in her deposition, part 1 was apparently filled out by Lee. The plaintiff testified that the signature at the bottom right hand corner of part 1 of the application appeared to be that of her husband. However, the plaintiff testified that although her husband's signature appears on the lower right hand corner of part 2 of the application (entitled "Declarations to the Medical Examiner"), the other handwriting on this part of the application was definitely not her husband's. This is consistent with Duignan's testimony that she had nothing to do with the other page (part 1) and that the handwriting thereon was not hers. (Her signature appeared on the lower left hand corner of part 2 of the application.) This testimony establishes beyond question that Lee did not fill in the an-

Duignan then stated that she had no independent recollection of having interviewed Lee, but that she prepared his form and answered the questions under the circumstances which she described in her affidavit. Thereafter, Duignan proceeded to testify about what "might" have happened or what "may" have happened when she took Lee's application. Initially she stated: "For example, I first checked 2(h) 'no,' and then changed my mind, either because he was still talking or thought of something, or because I thought it should be mentioned . . . ." She then speculated: "From the application, it appears that Mr. Lee had advised that he had had a cardiogram and, obviously, in the past he had had some difficulty at some time, either in chest pain or some other happening which moved him to obtain the cardiogram, and I answered the question . . . that the EKG in 1970 was 'negative results' with 'details unknown.'" Duignan then concluded that she did not recall what Lee said at the time, but it was her opinion that if he did have a heart condition at the time of the EKG, the answers in the application did not reflect that he misrepresented anything to her. She stated: "I could not say that he did not tell me of having some previous heart trouble; in fact, he may have done so and the answers which I have given on the questionnaire would be correct, or if incorrect made by me in good faith in my best judgment at the time."

In its opinion on the insurance company's motion for summary judgment, the district court concluded that the statements in Duignan's affidavit relating to her interview with Lee were based upon rank speculation and conjecture. The court concluded that the affidavit was clearly not based upon personal knowledge or recollection and that, therefore, it would ignore the affidavit and strike it under Fed.R.Civ.P. 56(e) (affidavits supporting or opposing a motion for summary judgment "shall set

forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). Duignan, the court reasoned, would not be allowed to testify about a matter on which she lacks personal knowledge. Fed.R.Evid. 602. As explained below, the district court erred in striking Duignan's entire affidavit.

We further conclude that the district court erred in holding that the misrepresentation defense of the insurance company was established as a matter of law.

## II.

■ Texas law governs the matter, and under that law the liability of an insurer may be avoided upon proof that the policy was procured by fraudulent misrepresentations of the applicant. Tex.Ins.Code art. 21.16 (Vernon 1963); *Robinson v. Reliable Life Insurance Company*, 569 S.W.2d 28 (Tex.1978); *Southern Farm Bureau Life Insurance Company v. Reed*, 563 S.W.2d 634 (Tex.Civ.App.1978, writ ref'd n.r.e.). Under Texas law, the elements of the misrepresentation defense are: (1) that a representation was made; (2) that it was false; (3) that the misrepresentation was material to the risk; (4) that the insurer relied on the misrepresentation in issuing the insurance policy; and (5) that the misrepresentation was made willfully with the intent to deceive or to induce the insurance company to issue the policy. *Reed*, 563 S.W.2d at 636.

■ In *Odom v. Insurance Company of the State of Pennsylvania*, 455 S.W.2d 195, 199 (Tex.1970), the Texas Supreme Court held that where "an application for insurance is attached to and made part of the policy and is accepted and retained by the insured, the insured is conclusively presumed to have knowledge of its contents and to have ratified any false statements therein." Therefore, the district court was correct in concluding that since Lee had

swers to the portion of the application entitled "Declarations to the Medical Examiner."

That Joni Duignan, the medical examiner, filled out part 2 of the application is further confirmed by the answer to question 2(h), which

was initially checked "no," but then changed to "yes"; next to the mark–over on the check in the "no" box appear the initials of "JD." It is safe to assume that Joni Duignan initialed the correction she made in answer to question 2(h).

accepted and retained the policy, to which the application was attached and made part thereof, he was conclusively presumed to have knowledge of the false statements appearing in part 2 of the application ("Declarations to Medical Examiner"). Moreover, the misrepresentations regarding Lee's heart condition were material to the risk as a matter of law. *Allen v. American National Insurance Co.*, 380 S.W.2d 604, 606 (Tex.1964). Based on the affidavits of two company officials, the district court also concluded that since the National Life Assurance Company of Canada was not aware of Lee's true health history (*i.e.* his heart condition), the company relied upon the health history representations in the application for insurance when it issued the policy to Lee. Since the plaintiff did not attempt to controvert the insurance company's reliance on the misrepresentations, and because the misrepresentations were so serious, reliance could be taken as conclusively established.

### III.

■ We hold that the district court erred in granting the insurance company's motion for summary judgment because Lee's intent to deceive or induce the issuance of the policy was not established as a matter of law.

In *Washington v. Reliable Life Insurance Co.*, 581 S.W.2d 153 (Tex.1979), the Texas Supreme Court apparently changed the law on summary judgment with respect to the misrepresentation defense of an insurance company. In *Washington*, the insurance company relied on the rule of *Odom*, contending that when an application containing false statements is attached to and made part of an insurance policy that is accepted by the insured, the insured is then conclusively presumed to have ratified the misrepresentations in the application, which perforce establishes the defense of misrepresentation. The Texas Supreme Court disagreed and held that it "does not automatically establish the defense of misrepresentations, for there is still outstanding the issue of intentional deception upon which [the insurance company] had the burden of proof." 581 S.W.2d at 160. The Court acknowledged that *Odom* denied recovery to the insured without requiring a finding of intent, but distinguished that aspect of *Odom* for two reasons: (1) "*Odom* and the cases cited therein concern violations of warranties made by the insured, whereas the instant case concerns representations . . .," [2] and (2) "there was strong evidence of collusion in *Odom*." *Id.* Therefore, *Washington* appears to establish the rule that intent to deceive or induce issuance of an insurance policy can never be proved as a matter of law to establish the misrepresentation defense in the absence of either a warranty that the facts contained in the application are true or evidence of collusion between the applicant and the insurance agent.

The decision of the Texas Supreme Court in *Washington*, together with the medical

---

**2.** In *Allied Bankers Life Insurance Co. v. De La Cerda*, 584 S.W.2d 529, 532 (Tex.Civ.App.1979, writ ref'd n.r.e.), the court, in discussing the distinction between a warranty and a representation in an insurance policy, stated:

"The Texas Supreme Court has recognized that a warranty in an insurance contract is ' "a statement made therein by the insured, which is susceptible of no construction other than that the parties mutually intended that the policy should not be binding unless such statement be literally true." ' [Citations omitted.] In other words, the parties must have intended that the policy stand or fall on the literal truth or falsity of the statement in question. Such warranties which cause forfeiture are disfavored in the law. [Citations omitted.]

"A representation is 'an oral or written statement which precedes the contract of insurance and is no part thereof, unless it be otherwise stipulated, . . . and relates to the facts necessary to enable the underwriter to form his judgment whether he will accept the risk, and at what premium.' [Citations omitted.] Thus, by definition a representation is not a part of the contract. This, however, does not preclude the inclusion of representations within the policy itself. 'Such statements will be given effect only as representations and not as warranties when it is expressly stipulated that they are merely representations, or if it appears from the contract read as a whole that they were so intended.' " [Citations omitted.]

examiner's affidavit, convinces us that there is a genuine issue of material fact as to Lee's intent to deceive or induce issuance of the policy in question. The district court improperly failed to consider any of Duignan's affidavit, which set forth competent, admissible evidence that Lee did not write down the answers to the questions on his health history and that the examiner did not usually record the answers to those questions in the same way which the applicant verbally answered them to her.[3] The medical examiner's testimony that she tried to answer each question favorably toward the applicant is significant in controverting an intent on the part of Lee to deceive the company or induce issuance of the policy. Although Duignan speculated that insurance companies wanted to sell policies no matter what and that they got mad when medical examiners found something wrong, this testimony would be admissible to establish the reason why she did not answer the health history questions the way in which the applicants responded, but instead in a way most favorable to them so that the company would insure them.

A factual issue on intent to deceive or induce issuance of a policy is further supported by the evidence that in part 2 of the application—the part filled out by the medical examiner—the answer to question 1(a) consists of "Dr." which is scratched out, thusly: "~~Dr.~~" However, on part 1 of the application, which was filled out by Lee himself, in response to the question, "Who is your doctor? His address," Lee wrote down "Dr. Lee Jewell, Irving, Texas." But the answer to question 1(a) on part 2, states: "Name and address of your personal physician? ~~Dr.~~ NONE."

Although the affidavit stated, "I do not have any independent recollection of having interviewed Mr. Lee . . .," and then went on to discuss a number of matters relating to the interview with Lee which are based on rank speculation and conjecture, it was improper for the district court

not to consider the parts of Duignan's affidavit that were based on personal knowledge and that set forth matters which would be admissible in evidence. The rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion. *See Perma Research and Development Company v. Singer Company,* 410 F.2d 572, 578 (2d Cir. 1969); *Fay v. United States,* 253 F.2d 936, 938 & n.2 (5th Cir. 1958); *State of Washington v. Maricopa County,* 143 F.2d 871, 872 (9th Cir. 1944), *cert. denied,* 327 U.S. 799, 66 S.Ct. 900, 90 L.Ed. 1024 (1946); *Southern Concrete Company v. United States Steel Corp.,* 394 F.Supp. 362, 380–81 (N.D.Ga.1975), *aff'd on other grounds,* 535 F.2d 313 (5th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Dickheiser v. Pennsylvania R. Co.,* 5 F.R.D. 5, 9 (E.D.Pa.1945), *aff'd,* 155 F.2d 266 (3d Cir. 1946), *cert. denied,* 329 U.S. 808, 67 S.Ct. 620, 91 L.Ed. 689 (1947).

For the foregoing reasons and considering the evidence in the light most favorable to the non–movant plaintiff, *Harvey v. Great Atlantic and Pacific Tea Company,* 388 F.2d 123, 124 (5th Cir. 1968), we conclude that there is a genuine issue of material fact concerning Lee's intent to deceive or induce issuance of the policy.

REVERSED and REMANDED.

---

3. Fed.R.Evid. 406 provides that "[e]vidence of the habit of a person or of the routine practice of an organization . . . is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."