**Rosemary GONZALES, et al., Plaintiffs,**

**v.**

**NORTH TOWNSHIP OF LAKE COUNTY, an Indiana Municipal Entity, et al., Defendants.**

**Civ. No. H83–402.**

United States District Court, N.D. Indiana, Hammond Division.

July 28, 1992.

ter in Houston (R. 307–308).

Ivan E. Bodensteiner, Valparaiso, Ind., Gregory R. Lyman, Munster, Ind., for plaintiffs.

Anthony DeBonis, Jr., East Chicago, Ind., Deborah L. Szczepanski, Merrillville, Ind., for defendants.

## MEMORANDUM OPINION AND ORDER

LOZANO, District Judge.

This matter is before the Court on the Plaintiffs' Motion for Partial Summary Judgment, filed January 31, 1985; the Defendants' Motion for Summary Judgment, filed April 4, 1985; and the Defendants' Motion to Strike, filed April 4, 1985. For the reasons set forth herein, the Plaintiffs' Motion for Partial Summary Judgment is DENIED; the Defendants' Motion for Summary Judgment is GRANTED; and the Defendants' Motion to Strike is GRANTED IN PART and DENIED IN PART.

BACKGROUND

■ Wicker Memorial Park ("the Park") is a public park owned and maintained by North Township, Lake County, Indiana ("the Township").[1] A plaque on the wall of the clubhouse in the Park commemorates the Park's dedication in 1927, and bears the words of former President Calvin Coolidge:

> As the inhabitants of North Township repair to this park in years to come, as they are reinvigorated in body and mind by its use, as they are moved by the memory of the heroic deeds of those to whom it is dedicated, may they become partakers and promoters of a more noble, more exalted, more inspired American life.

(See Defendants' answers to Interrogatories Nos. 2, 3, 13 of Plaintiffs' First Interrogatories.)

---

1. Newspaper articles, letters and a petition supporting both sides of the issue in this case were provided to the Court by citizens not parties to this action. As these documents were not pro-vided by a party to this action and would otherwise not be admissible into evidence, the Court may not consider them to aid in its determination of this action.

In October 1955, a monument was erected in the southeast corner of the Park, within approximately forty-five (45) yards of the intersection of Ridge Road and U.S. Highway 41 (the "Monument").[2] (See Defendants' answer to Plaintiffs' Request for Admissions, No. 1.) The Monument is in the form of a crucifix and is approximately sixteen feet (16') high, seven feet—ten inches (7'10") wide, and stands on a cement base which is two feet (2') high. The figure on the cross is six feet (6') tall and six feet (6') wide. (See Appendix to this Opinion and Defendants' answer to Interrogatory No. 18 of the Plaintiffs' First Interrogatories.) The Monument also bore a plaque, which had originally been attached to the base of the Monument. The plaque, which was twelve inches by twenty-four inches (12" × 24"), was dated October 16, 1955, and bore the following inscription: "For God and Country. Dedicated to the memory of men and women whose love for this nation enabled them to make the supreme sacrifice of life itself in its defense." (See Appendix, Defendants' answers to Interrogatories Nos. 13 and 15 of Plaintiffs' First Interrogatories; see also the photograph which is described as Attachment No. 1 and which is attached to the verified statement in support of Motion for Partial Summary Judgment filed as Exhibit A to the Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment, filed January 31, 1985.) The plaque was discovered to be missing on or about November 21, 1983. (See Defendants' answers to Interrogatories Nos. 1(a) and (d) of Plaintiffs' First Interrogatories.)

The Plaintiffs, who are all citizens of the United States and residents of North Township, Lake County, Indiana, filed this suit under 42 U.S.C. § 1983 claiming that "[b]y maintaining a religious symbol of the Catholic church in the Park at public expense, the Defendants have caused injury to the Plaintiffs by infringing their use and enjoyment of Wicker Memorial Park and offending their moral and religious sensitivity."

(See Complaint, ¶ 8.) The Plaintiffs' request that the Court: (1) issue a declaratory judgment that the presence and maintenance of the Monument in the Park violates the First Amendment to the United States Constitution; (2) issue a permanent injunction enjoining the Defendants from maintaining the Monument in the Park and requiring the Defendants to remove the Monument from the Park; and (3) award Plaintiffs' damages, costs and attorney's fees. The Defendants, North Township of Lake County, an Indiana municipal entity, and Gregory Cvitkovich[3] the Trustee of North Township, contend in their Motion for Summary Judgment that, with the exception of Plaintiff, Louis Appleman, Plaintiffs, Rosemary Gonzales, Harry Levin, Melvin Schlesinger, and Richard Vanorman, lack standing to bring this cause of action, and that the statute of limitations bars each of the Plaintiffs from bringing this action. The Defendants also argue that, in any event, the presence of the Monument in the Park does not violate the Establishment Clause of the United States Constitution.

## DISCUSSION

*Defendants' Motion to Strike Exhibits "B" and "C" Attached to the Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

The Defendants contend that Exhibits "B" and "C" attached to the Plaintiffs' Memorandum in Support of Motion for Summary Judgment, filed January 31, 1985, must be stricken because they do not conform to the requirements of Rule 56(e) of the Federal Rules of Civil Procedure. Plaintiffs' Exhibit "B" is a letter from Constant H. Jacquet, Jr., Staff Associate for Information Services of the National Council of the Churches of Christ in the U.S.A. and editor of the *Yearbook of American and Canadian Churches*, to the Plaintiff, Melvin Schlesinger, dated January 18, 1985. Jacquet's letter to the Plaintiff, Schlesinger, contains the following prefatory statement:

---

**2.** It is unclear from the record who, in fact, owns the Monument.

**3.** Pursuant to Federal Rule of Civil Procedure 25(d)(1), the court substitutes the name Gregory Cvitkovich, successor to the original defendant, Horace Mamala, as Trustee of North Township.

The information supplied below comes from my personal knowledge of religious practices of various religious bodies and from conversations with officials and other informed members of the religious bodies themselves. I believe the following statement to be an accurate generalization on the use of the crucifix and cross in various religious bodies....

(See Exhibit "B"). The Plaintiffs contend that the Defendants' Motion to Strike Exhibit "B" must be denied because the letter from Constant H. Jacquet, Jr. is intended to be a statement of an expert.

Rule 56(e) of the Federal Rules of Civil Procedure provides in relevant part that:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

"An affidavit submitted in connection with a summary judgment motion is subject to a motion to strike if it does not measure up to the standards of Rule 56(e)." *Southern Concrete Co. v. United States Steel Corp.*, 394 F.Supp. 362, 380 (N.D.Ga.1975), *aff'd*, 535 F.2d 313 (5th Cir.1976). "Affidavits must be made upon personal knowledge, be devoid of hearsay, conclusory language, and statements which purport to examine thoughts as well as actions." *Carey v. Beans*, 500 F.Supp. 580, 583 (E.D.Pa.1980), *aff'd*, 659 F.2d 1065 (3rd Cir.1981).

■ Familiarity with the proceedings does not equal the personal knowledge required for an affidavit under Rule 56(e). *Walpert v. Bart*, 280 F.Supp. 1006, 1010 (D.Md.1967), *aff'd*, 390 F.2d 877 (4th Cir. 1968). Moreover, "belief, no matter how sincere, is not equivalent to knowledge, and ... the facts set forth in an affidavit in opposition to a motion for summary judgment must be such as would be admissible in evidence should they be given from the witness stand during the trial of a case." *Lark v. West*, 182 F.Supp. 794, 798 (D.D.C.), *aff'd*, 289 F.2d 898 (D.C.App.

1960), *cert. denied*, 368 U.S. 865, 82 S.Ct. 114, 7 L.Ed.2d 63 (1961). "It is clear that an affidavit made on information and belief cannot support on summary judgment the averments it attempts to uphold." *Walpert*, 280 F.Supp. at 1010 (quoting *Schoenbaum v. Firstbrook*, 268 F.Supp. 385, 390 (S.D.N.Y.1967), *aff'd*, 405 F.2d 200 (2d Cir.1968)). "[S]tatements prefaced by the phrases, 'I believe' or 'upon information and belief' or those made upon an 'understanding', ... are properly subject to a motion to strike." *Carey*, 500 F.Supp. at 583.

■ Jacquet's letter, which the Plaintiffs appear to seek to introduce as the opinion of an expert, contains personal knowledge as well as inadmissible hearsay. Rule 56(e) "requires that affidavits in support of or opposition of a summary judgment motion set forth facts that would be admissible in evidence. It is well-established that hearsay evidence in such affidavits is entitled to no weight." *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). In such cases, where admissible information is co-mingled with inadmissible information, "[t]he rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion." *Lee v. National Life Assurance Co. of Canada*, 632 F.2d 524, 529 (5th Cir.1980) (citations omitted). In this case, however, it is impossible to distinguish Jacquet's knowledge from the hearsay contained in the affidavit. As one district court has held,

While the court may strike or disregard the inadmissible portions of such affidavit not in conformity with the rule and consider the rest of the affidavit, the entire affidavit may be disregarded if inadmissible matter is so interwoven or inextricably combined with the admissible portions that it is impossible, in the practical sense, to separate them.

*Southern Concrete*, 394 F.Supp. at 380–381. Moreover, this Court finds Jacquet is not qualified as an expert based on the credentials provided in her letter. Accordingly, the Defendants' Motion to Strike Exhibit "B" attached to the Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment is hereby GRANTED.

■ Exhibit "C" is a compilation of newspaper articles printed in the Hammond Times in October 1955, together with a statement as to their authenticity from Marjorie Sohl of the Hammond Public Library, Hammond, Indiana, and a newspaper article printed in the Chicago Sunday Tribune on October 9, 1955, together with a statement as to its authenticity from Gerald W. Delaney of the Chicago Public Library, Chicago, Illinois. (See Exhibit "C", attached to the Memorandum in Support of Motion for Summary Judgment, filed January 31, 1985, (hereinafter referred to as Exhibit "C")). The documents comprising Exhibit C are considered "ancient" within the meaning of Federal Rule of Evidence 803(16), which provides that "[s]tatements in a document in existence twenty years or more the authenticity of which is established [are not excluded by the hearsay rule even though the declarant is unavailable]." Newspaper articles are self-authenticating pursuant to Rule 902(6). As the newspaper articles in Exhibit C are well more than twenty-years old, the statements contained therein are admissible into evidence and thus this Court can utilize them to aid in the determination of this case. *See Ammons v. Dade City, Fla.*, 594 F.Supp. 1274, 1280 n. 8 (M.D.Fla.1984), *aff'd*, 783 F.2d 982 (11th Cir.1986); *Bell v. Combined Registry Co.*, 397 F.Supp. 1241, 1246–47 (N.D.Ill.1975), *aff'd*, 536 F.2d 164, 166–67 (7th Cir.1976); Notes of Advisory Committee on 1972 Proposed Rules (citing *Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir.1961)). Accordingly, Defendant's Motion to Strike Exhibit "C" is DENIED.

### Motion for Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated "that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988); *Beard v. Whitley County R.E.M.C.*, 840 F.2d 405, 409 (7th Cir.1988); *Roman v. United States Postal Serv.*, 821 F.2d 382, 385 (7th Cir.1987); *McGraw–Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1167 (7th Cir.1986); *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267 (7th Cir.1986). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts which might effect the outcome of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter*, 840 F.2d at 434 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–252, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–162, 90 S.Ct. 1598, 1609–11, 26 L.Ed.2d 142 (1970); *Backes v. Valspar Corp.*, 783 F.2d 77, 79 (7th Cir.1986). To preclude summary judgment, a nonmoving party must show a material issue of fact. "A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard*, 840 F.2d at 410.

■ In deciding a motion for summary judgment, a district court may consider material in the record that is beyond the pleadings, which would otherwise be admissible at trial. *Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 490 (7th Cir.1988); *First Nat'l Bank Co. v. Insurance Co. of North America*, 606 F.2d 760, 766 (7th Cir.1979). Further, this Court may, *sua sponte*, take judicial notice of adjudicative facts pursuant to Rule 201 of the Federal Rules of Evidence. *Toney v. Burris*, 829 F.2d 622, 626–27 (7th Cir.1987); *Dickinson v. Indiana State Election Bd.*,

740 F.Supp. 1376, 1390 (S.D.Ind.1990). *See also Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir.1987) (court may take judicial notice of facts when deciding a 12(b)(6) motion to dismiss).

Upon review of the parties' cross-motions for summary judgment, the Court finds that there is no genuine issue of material fact presented by the motions. As such, the issues presented by the parties' motions are ripe for summary judgment.

*Standing*

In support of their motion for partial summary judgment on the standing issue, Defendants attach several of Plaintiffs' depositions and claim that Plaintiffs have standing neither as taxpayers nor as parties seeking to redress a noneconomic injury.

■■ Article III of the Constitution mandates that federal courts have actual cases and controversies before them before proper adjudication. *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The Art. III doctrine that requires a litigant to have standing to invoke the power of a federal court is perhaps the most important doctrine of judicial restraint in a democratic society. *Id.* "In essence, the question of standing is whether the litigant is entitled to have the Court decide the merits of the dispute or of particular issues." *Id.* at 750–51, 104 S.Ct. at 3324 (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). The standing doctrine embraces several judicially imposed limits on the exercise of federal jurisdiction, such as the "general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of the interest protected by the law invoked." *Id.* 468 U.S. at 751, 104 S.Ct. at 3324. In addition to these "prudential components", the standing doctrine also has constitutional limitations. *Id.* For instance, the alleged injury must be "distinct and palpable" and not "abstract", "conjectural", or "hypothetical". *Id.* (cita-

tions omitted). Moreover, the injury must be fairly traceable to the challenged action with relief likely to follow from a favorable decision. *Id.*

Traditionally, taxpayers face an uphill climb when asserting standing solely by virtue of their taxpayer status. This is so because of the difficulty in proving a judicially cognizable injury. *See Id.* at 754, 104 S.Ct. at 3326; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 482–86, 102 S.Ct. 752, 763–66, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 223 n. 13, 94 S.Ct. 2925, 2933 n. 13, 41 L.Ed.2d 706 (1974).

In *Flast v. Cohen*, the United States Supreme Court addressed the issue of taxpayer standing. 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). The taxpayer-plaintiffs challenged Congress' appropriation of federal funds to finance instruction in reading, arithmetic, and other subjects in religious schools, and to purchase textbooks and other instructional materials for use in such schools. *Id.* at 85–86, 88 S.Ct. at 1945. The Government argued that under no circumstances should standing be conferred on federal taxpayers to challenge a federal taxing or spending program. *Id.* at 98, 88 S.Ct. at 1951. In finding no absolute bar in Article III to suits by federal taxpayers challenging unconstitutional federal taxing and spending programs, the Court fashioned the following test to determine whether a taxpayer has standing:

> The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute.... Secondly, the taxpayer must establish a nexus be-

tween that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8.

*Id.* at 102–03, 88 S.Ct. at 1954. Thus, under this test the Court found that the plaintiff-taxpayer met both requirements, and therefore had standing to challenge Congress' appropriation to further programs in religious schools. *Id.* at 103, 88 S.Ct. at 1954. The above principles equally apply when a state act or action is assailed. *See Doremus v. Board of Education,* 342 U.S. 429, 433–35, 72 S.Ct. 394, 397–98, 96 L.Ed. 475 (1952).

■ Defendants claim that Plaintiffs cannot establish taxpayer status as there is no evidence that any public funds at any time have been used in the erection or the maintenance of the Monument at issue. In the Plaintiffs' reply memorandum, filed May 20, 1985, the Plaintiffs assert that the crux of the matter is simply that the area of the Park set aside to house the Monument is, like the rest of the Park, maintained through public funds.

Based on the above facts, this Court finds that the Plaintiffs do not have standing as taxpayers, as Township funds were not used to put up the Monument, nor are Township funds used to maintain the Monument, albeit that funds are used to maintain the area surrounding the Monument. As the Township is expending no funds in connection with the Monument, there is no nexus between the Plaintiffs' taxpayer status and their alleged violation of the Establishment Clause of the First Amendment and thus no injury relating thereto. *Harris v. City of Zion,* 927 F.2d 1401, 1405 n. 4 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3054, 120 L.Ed.2d 920 (1992); *ACLU v. City of St. Charles,* 794 F.2d 265, 267 (7th Cir.), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986). But the inquiry does not end here.

■ Plaintiffs may establish standing in this case if they can show that they have a noneconomic injury, or standing in their own right. Defendants claim that the only person who has standing in this case is Louis J. Appleman, as he has demonstrated injury by his statements that he has not used Wicker Memorial Park since the erection of the Monument. Each Plaintiff contends that they are morally and religiously offended by the display of the Monument, but the fact that they are offended by the Monument does not confer standing upon them. *See Valley Forge,* 454 U.S. at 485–87, 102 S.Ct. at 765–66; *St. Charles,* 794 F.2d at 268; *Harris,* 927 F.2d at 1405. "An identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *Harris,* 927 F.2d at 1406 (quoting *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1972). "It is the willingness of the plaintiffs to incur a tangible, albeit small cost that validates the existence of genuine distress and warrants the implication of federal jurisdiction." *Harris,* 927 F.2d at 1406 (citing *St. Charles,* 794 F.2d at 268). The Seventh Circuit Court of Appeals has held that the curtailment of a plaintiff's use of a public right-of-way is a distinct, palpable injury to confer standing. *St. Charles,* 794 F.2d at 268. Thus, in *American Civil Liberties Union v. City of St. Charles,* the Seventh Circuit found standing where the plaintiffs alleged that they altered their behavior, *i.e.,* detoured, at some inconvenience to themselves, around the streets they ordinarily used to avoid the display of a cross on the roof of a city firehouse. *Id.* at 268–69. *See also Harris,* 927 F.2d at 1405.

Defendants are correct in stating that only Appleman has standing to bring this suit. Plaintiffs Gonzales, Vanorman, Levin, and Schlesinger, have not stated that they have altered their behavior in any way, meaning that they take alternate routes to avoid seeing the Monument or no longer go to the Park to enjoy its facilities because of its presence. *See* Gonzales Dep. at 14; Vanorman Dep. at 18–19; Lev-

in Dep. at 8–9; and Schlesinger Dep. at 18, 24–25. Nor can these Plaintiffs point to any other kind of injury which would confer standing. On the other hand, Mr. Appleman has stated that he worked at the Park several years ago and stopped working for the Park when they put up the Monument. (Appleman Dep. at 13–19) Appleman also stated that he has only been to the Park three times in the past fifteen years (1968–1983) and rarely uses the facilities because of the presence of the crucifix on the Monument. *Id.* In fact, on several occasions has refused to attend activities because of its presence. *Id.* To this date, Appleman avers that he does not want to go to the Park because of the presence of the Monument. *Id.* Like detouring a public right-of-way to avoid a cross on top of a fire station, Appleman has curtailed his use of a public benefit, the use of the Park, and has shown that he has been injured by the erection of the Monument. Accordingly, Appleman has standing to maintain this suit. However, the other Plaintiffs, Gonzales, Levin, Schlesinger, and Vanorman have not shown any distinct injury, and they are hereby DISMISSED from this action.

### Statute of Limitations

 Defendants next claim that Appleman's action is barred by the statute of limitations. In *Wilson v. Garcia*, the Supreme Court held that the applicable statute of limitations in § 1983 actions is governed by the law of the State in which the federal court sits. 471 U.S. 261, 268–69, 105 S.Ct. 1938, 1943, 85 L.Ed.2d 254 (1985); *Dugan v. Ball State Univ.*, 815 F.2d 1132, 1135 (7th Cir.1987). More specifically, § 1983 actions are governed by personal injury statutes of limitations. *Wilson*, 471 U.S. at 276–280, 105 S.Ct. at 1947–1949. In Indiana, the limitations period for filing a cause of action for personal injury is two (2) years. Ind.Code § 34–1–2–2(1) (1988). After reviewing the pleadings, it is apparent that Appleman became aware of the erection of the Monument in 1955, well beyond the two-year limitations period. Appleman argues that the display of the Monument is a continuing injury, and thus this action is not barred by the statute of limitations. The day a cause of action accrues presents a federal question, even though a state statute of limitations is utilized. *Rawlings v. Rey*, 312 U.S. 96, 98, 61 S.Ct. 473, 474, 85 L.Ed. 605 (1941); *Sandidge v. Rogers*, 167 F.Supp. 553, 556 (S.D.Ind.1958).

Appleman is correct that his action is not barred by the Indiana statute of limitations. Appleman alleges a continuing violation of the First Amendment, and as each day there is a violation, each day his cause of action accrues. *See Hill v. Trustees of Ind. Univ.*, 537 F.2d 248, 254 (7th Cir.1976); *Concerned Tenants Ass'n of Indian Trails Apartments v. Indiana Trails Apartments*, 496 F.Supp. 522, 525, 526 (N.D.Ill.1980). *See also Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980); *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1480–81 (9th Cir.1989).

### Establishment Clause Claim

 Appleman claims that the continued presence of the Monument in the Park violates the Establishment Clause of the First Amendment because the crucifix on the Monument is clearly a religious symbol and not a "war memorial" as the Defendants claim. Appleman avers this is evident because the plaque which was attached to the base of the Monument was located at the base of the crucifix, was not illuminated at night, and was very small (approximately 12″ × 24″). Further, at this time, as the plaque is no longer on the Monument, there is no indication that it is a war memorial. Conversely, Defendants argue that there is no evidence that the Township or any of its officers intended that the existence of the monument have any religious purpose, as the monument was specifically erected in dedication to the memory of those who lost their lives while serving their country. Moreover, because there is entirely lacking any evidence of any public expenditure in relation to the maintenance or the erection of the Monument, there is no entanglement between the Township and any religion.

The First Amendment provides that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." Throughout the history of the United States Supreme Court, the Court has attempted to encapsulate the essential precepts of what the Establishment Clause has come to stand for in American jurisprudence. A summary of these precepts are as follows:

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice-versa.*

*County of Allegheny v. ACLU,* 492 U.S. 573, 591, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989) (quoting *Everson v. Board of Educ.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–512, 91 L.Ed. 711 (1947)). In deciding these types of cases, the Supreme Court has utilized the *Lemon v. Kurtzman* test to determine whether a government practice violates the Establishment Clause. Under the *Lemon* analysis, for a practice or statute which touches upon religion to be permissible under the Establishment Clause, it must: (1) have a secular purpose; (2) neither advance nor inhibit religion in its principal or primary effect; and (3) not foster an excessive entanglement with religion. 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). *See Allegheny,* 492

U.S. at 592, 109 S.Ct. at 3100 n. 44; *Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 2570, 101 L.Ed.2d 520 (1988); *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987). *See also Lee v. Wiesman,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Court held that school prayer at graduation ceremony amounted to coercing students to participate or support religion).

In *County of Allegheny v. American Civil Liberties Union,* the ACLU challenged the placement of a creche in the County Courthouse and the displaying of a menorah in front of the City–County Building.[4] 492 U.S. at 588, 109 S.Ct. at 3098. The Court paid particular attention to whether the challenged governmental practice has the purpose or effect of "endorsing" religion, the second prong of the *Lemon* test. *Id.* Although declining to propound a definition of endorsement, the Court noted that at the very least, the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief" or from "making adherence to religion relevant in any way to a person's standing in the political community." *Id.* 492 U.S. at 573, 109 S.Ct. at 3086 (quoting *Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984)).

Before reaching the merits, the Court discussed its decision in *Lynch v. Donnelly, supra,* where the plaintiffs attacked a City's placement of a creche in its annual Christmas display which was located in a private park within the downtown shopping district. *Id.* 492 U.S. at 593, 109 S.Ct. at 3101. In *Lynch,* the creche was surrounded by Christmas trees, a Santa Claus, reindeer and other secular figures. *Id.* 492 U.S. at 595, 109 S.Ct. at 3102. In analyzing the *Lynch* decision, the *Allegheny* court found a common thread among the concurring and dissenting opinions. Meaning that:

The government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of

***

**4.** The building is jointly owned by the City of Pittsburgh, Pennsylvania and Allegheny County.

religious symbolism depends upon its context.... [W]hen evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether "the challenged governmental action is sufficiently likely to be perceived by adherence of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices".

*Id.* 492 U.S. at 597, 109 S.Ct. at 3103 (quoting *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)). Thus, the Court had to determine whether the display of the creche had the effect of endorsing or disapproving religious beliefs. *Id.* The Court noted that although under *Lynch* the effect of a creche display turns on its setting, in this case the creche stood alone as the single element of the display on the grand staircase of the County Courthouse. *Id.* 492 U.S. at 599, 109 S.Ct. at 3104. Thus, by permitting the display of the creche in this setting, "the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message." *Id.* Moreover, the Court found that the fact that the creche wore a sign disclosing its ownership by a Roman Catholic organization did not alter its conclusion. *Id.* On the contrary, the sign demonstrated that the government was endorsing the religious message of this organization rather than conveying a religious message of its own. Thus, the county lent its support to the communication of a religious organization's religious message. *Id.* 492 U.S. at 601, 109 S.Ct. at 3105.

In *Allegheny,* the ACLU also challenged the display of a menorah in front of the City–County Building. The menorah stood next to a Christmas tree and a sign saluting liberty. *Id.* 492 U.S. at 614, 109 S.Ct. at 3112. Noting that the menorah has both secular and religious dimensions, and that the Christmas tree is not a religious symbol, but typifies the secular celebration of Christmas, the Court held that the combination of the two does not endorse both the Christian and Jewish faiths, but instead is a secular celebration of Christmas coupled with an acknowledgment of Hanukkah. *Id.* 492 U.S. at 617–18, 109 S.Ct. at 3113–14.

Although the principles of *Allegheny* are instructive in this case, this Court must also consider the recent Seventh Circuit Court of Appeals opinion in *Doe v. Small,* 964 F.2d 611 (7th Cir.1992). In *Doe,* the Ottawa Retail Merchants' Association, a private organization, commissioned the painting of sixteen (16) canvases depicting scenes from the life of Christ in 1956. *Id.* at 612 These paintings were displayed intermittently in Washington Park, located in the heart of the City of Ottawa, Illinois for the next thirty (30) years during the Christmas seasons.[5] *Id.* When the paintings were displayed they occupied less than one half of the west side of the park, occupying approximately 6.34% of the park. *Id.* at 613. When the Jaycees displayed them, in the 1980's, they put up a sign on the sidewalk which stated, "THIS DISPLAY HAS BEEN ERECTED AND MAINTAINED SOLELY BY THE OTTAWA JAYCEES, A PRIVATE ORGANIZATION, WITHOUT THE USE OF PUBLIC FUNDS." *Id.* at 613. A citizen of Ottawa challenged the display of the paintings and moved for summary judgment, arguing that the display of the paintings in a public park violated the Establishment Clause of the First Amendment because it constituted a state establishment of religion. *Id.* at 615–17. The Jaycees also moved for summary judgment, arguing that the paintings constituted private religious speech, protected by the Free–Speech Clause of the First Amendment. *Id.* at 617. The district court entered judgment in the plaintiff's favor, holding that the display violated the Establishment Clause. *Id.*

In *Doe,* the Seventh Circuit emphasized that Washington Park was a quintessential public forum well-removed from the seat of

---

**5.** Except for the years 1964–67 when the City arranged for the erection of the paintings, the display was exhibited by private parties. The Junior Chamber of Commerce ("Jaycees") eventually became the caretakers of the paintings and later transferred them to the Ottawa Freedom Association.

city government, noting that City Hall was three blocks away and that no city buildings bordered the park. *Id.* at 613. The court observed that the park was historically an open public forum with free and equal access for all lawful purposes, and noted that a City Council member stated in his deposition that the City would allow an individual to display paintings depicting devil worship without first seeking its permission. *Id.* at 614. The court also placed emphasis on the fact that the park had historically been the site of a broad array of private and religious activities, especially during recent years. *Id.* at 614–15. In addition, the court found that in Washington Park the City, itself, placed several Christmas decorations in the park, such as lights, candles, bows, artificial snowflakes, and a fifteen foot snowman. *Id.* at 615.

The Seventh Circuit did not address the issue of whether or not the City of Ottawa endorsed the Jaycees' religious speech because the City did not appeal. However, in reversing the district court's decision, the court noted that the park was a public forum, and that "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and the Free Exercise Clauses protect." *Id.* at 617 (quoting *Board of Educ. of Westside Community Schools v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (emphasis in original). Thus, when the district court enjoined any future display of the paintings in the park by any group, the Seventh Circuit stated that the district judge ignored this "crucial difference". *Id.* The court stated that the following is an appropriate starting point in analyzing whether private speech may be excluded from a quintessential public forum:

> In places which by long tradition or by government fiat have been *devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed.* At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public and, time out of

mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions". *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion *it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.* (citation omitted.)

*Id.* at 618 (emphasis in original). The district court found that the City must regulate religious speech in Washington Park if such speech presents the danger of a violation of the Establishment Clause. *Doe v. Small*, 726 F.Supp. 713, 724 (N.D.Ill.1989). The Seventh Circuit rejected the district court's findings, stating that the Supreme Court has repeatedly refused to find the Establishment Clause to be a sufficiently compelling interest to exclude private religious speech even from limited public forums created by government. *Id.* (citing *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981)).

The plaintiff argued that Ottawa had no equal access policy for Washington Park, and thus, private parties were not entitled to display the paintings. *Id.* at 619 The court summarily dismissed this argument, stating that in the absence of any allegation (much less actual proof) that Ottawa has denied any person equal access to the park, it is immaterial that Ottawa does not have an officially stated policy of equal access. *Id.* at 619. Further,

> ... the Constitution mandates that religious speakers may not be discriminated against in a public forum on the basis of their speech. The City of Ottawa is required to comply with the constitutional mandate regardless of whether it has an officially stated policy of doing so, and Doe has failed to demonstrate non-compliance. Moreover, the mere presence of religious symbols in a public forum does not violate the Establishment Clause, since the government is not presumed to endorse every speaker that it fails to

censor in a quintessential public forum far removed from the seat of government.

*Id.* at 619.

The court also noted that its decision was consistent with its precedent, including the recent case of *Doe v. Village of Crestwood,* 917 F.2d 1476, 1478 (7th Cir.1990), where they reviewed an injunction prohibiting an Italian mass from being said at an Italian festival. Although the panel majority disagreed as to whether the Village of Crestwood was the sponsor of the mass, they were in full agreement on the right of private parties to engage in religious expression in a public forum:

> The Park is a public forum. If the Festival, too, is open to the private groups that wish to participate, and if the Crestwood Women's Club (or a church) were the sponsor of the mass, it would be difficult to find an obstacle in the Establishment Clause of the First Amendment ... *A government may not close its public forums to religious practice by private parties. Widmar v. Vincent,* 454 U.S. 263 [102 S.Ct. 269, 70 L.Ed.2d 440] (1981); *Fowler v. Rhode Island,* 345 U.S. 67 [73 S.Ct. 526, 97 L.Ed. 828] (1953). Although the holding of the mass in a public park creates a possibility that some members of the public will assume sponsorship (as opposed to acquiescence) by the polity, *the government's obligation not to discriminate against religious speech and circumstances and which secular speech would be allowed prevails.*

*Id.* at 620.

Based on the analysis of the above precedents, this Court can reach but one conclusion: That the Township has not violated the Establishment Clause by permitting the Monument to occupy a space in Wicker Memorial Park. *See Americans United for Separation of Church and State v. City of Grand Rapids,* Nos. 90–2337, 91–1391, 91–1448, 1992 WL 77643 (6th Cir. April 21, 1992) (LEXIS, Genfed, Cir file) (placement of menorah in public park violated Establishment Clause because of proximity to city, county and federal buildings); *Hewitt v. Joyner,* 940 F.2d 1561 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992) (county ownership and maintenance of public park that contained exclusively immovable religious statutes violated California's Establishment Clause); *Doe v. City of Crestwood,* 917 F.2d 1476 (7th Cir.1990) (Italian mass said at city festival in city park, a public forum, does not violate Establishment Clause for city may not discriminate against religious speech); *ACLU v. Wilkinson,* 895 F.2d 1098 (6th Cir.1990) (stable placed on state capitol grounds during Christmas season did not violate the Establishment Clause because it was secular in nature and was placed in a public forum); *Kaplan v. City of Burlington,* 891 F.2d 1024 (2d Cir.1989), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990) (display of menorah in City Hall Park would violate Establishment Clause because of proximity to seat of municipal authority); *Eugene Sand & Gravel, Inc. v. City of Eugene,* 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied, sub nom. Lowe v. Eugene Sand & Gravel, Inc.,* 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977) (display of large cross in public park as a veterans' war memorial does not violate constitutional requirements despite the fact that it is a religious symbol); *Meyer v. Oklahoma City,* 496 P.2d 789, 792 (Okla.1972), *cert. denied,* 409 U.S. 980, 93 S.Ct. 314, 34 L.Ed.2d 244 (1972) (presence of Latin Cross on fair grounds is constitutional because of distinct, secular, commercial environment). Wicker Memorial Park is and has been a gathering place for residents to play golf, swim, have cookouts, hold high school reunions, and other community activities. The Court takes judicial notice that the following are available to the public at the Park: an eighteen hole golf course, tennis courts, an arcade, batting cages, miniature golf, a driving range, scenic walks, a pavilion, picnic grounds, volleyball courts, a social center, a playground (with equipment painted red, white, and blue), jogging trails,

cross country skiing, and ice skating.[6] The Court also takes judicial notice that the Park has "336 acres of dedicated fun," and in the past has been a place to hold bar association and political meetings.[7] The Monument occupies less than .003% of the acreage in the Park. Under the *Lemon* analysis, this Court first finds that the Monument has a secular purpose, i.e., it is a war memorial to those who have defended our Country. That is not to say that the Monument does not have religious connotations. In an October 9, 1955, article in the Chicago Sunday Tribune one reporter quoted the Chairman of the Catholic Action Committee for the Fourth Degree Knights of Columbus of the Abraham Lincoln General Assembly in Northern Indiana as stating that the purpose of erecting the Monument is to remind motorists of the importance of religion in everyday life and to "make Lake County [Ind.] the most God-fearing area in the midwest." *See* Plaintiff's Requests for Admission, Exh. A. However, in the same article, the reporter stated the Monument "will be dedicated to service men who have given their lives in recent wars," noting that American Legion posts from Hammond, Gary, and neighboring cities will post colors at its dedication ceremony. *Id.* Following this article, there are a number of articles which evidence that the community was "in a stir" about the erection of the Monument. *See* Exh. C, attachments 2–8 in support of Appleman's Motion for Partial Summary Judgment. As to its erection, there was a

> ... parade from the clubhouse to the site were [sic] members of the American Legion and Veterans of Foreign Wars color guards, the 4th Degree Knights of Columbus, Boy Scouts, Girl Scouts, National Council of Catholic Men, National Council of Catholic Women, and Catholic Nurses from area hospitals.
>
> The ceremony ended with the singing of "God Bless America" and the sounding of "Taps".

Attachment 5, Exhibit C, *Plan No Legal Action to Remove Crucifix*, Hammond Times, October 17, 1955.

Thus, it is clear that the ceremony and parade dedicating the Monument was secular in nature. It is also important to note that the name of the Park, Wicker Memorial Park, suggests the secular nature of the Park. In fact, as stated earlier, the plaque on the old clubhouse in the Park, commemorating its 1927 dedication, demonstrates the Park's memorial purpose, as well as the plaque which used to be attached to the base of the Monument. *See infra.* Consequently, although the Monument may not be a part of a larger display, it is apparent that Wicker Memorial Park is what its name suggests, a park dedicated to the memory of American soldiers.[8] Admittedly, the Monument is a representation of the Knights of Columbus' belief in Christ. However, it is only necessary that under the Establishment Clause that a practice have *a* secular purpose, even if it does have overlapping religious purposes. *Lynch v. Donnelly*, 465 U.S. 668, 681 n. 6, 104 S.Ct. 1355, 1363 n. 6, 79 L.Ed.2d 604 (1984); *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). This Court further finds that the Monument's secular attributes far outweigh any religious connotations based on the facts surrounding its dedication.

Secondly, this Court finds that the placement of the Monument at Wicker Memorial Park does not advance or inhibit religion in its principal or primary effect or otherwise endorse or disapprove of religion. As the Monument was erected by the Knights of Columbus, and it is not maintained by the Township, the average citizen would not believe that the Township's aim was to advance or endorse Christianity or Catholicism in particular. Further, the Monument occupies a minutial amount of the Park, is surrounded by secular activities and oppor-

---

**6.** See sign posted at entrance to Park on Ridge Road and at corner of Indianapolis Boulevard and Ridge Road.

**7.** See footnote 4.

**8.** It is also interesting to note that catacorner to the Monument is another war memorial which displays the flags of the Army, Navy, Marines, Air Force, and Coast Guard.

tunities at the Park, and is part and parcel of a "Memorial Park". This conclusion is also supported by the fact that the Monument is located far from the seat of government. The Court takes judicial notice of the fact that the North Township Trustees offices are located at 2105 Broadway in East Chicago, Indiana, and at 5947 Hohman Avenue in Hammond, both of which are several miles from the Park. This Court finds that this result is mandated even though the Monument occupies a permanent place in the Park. Although the permanent nature of the memorial may lead to the appearance that the Township endorses Catholicism, this perception must be buttressed by the fact that the Park is far removed from Township offices.

Third, the placement of the Monument in Wicker Memorial Park does not foster an excessive entanglement with religion. Since the erection of the Monument, the Township has had little to do with its maintenance or with activities in connection with the Monument as a war memorial. The mere presence of the Monument on Township property far removed from the seat of government cannot constitute excessive entanglement without any type of affirmative action taken by the Township.

Lately, this Court finds that Wicker Memorial Park is a "quintessential public forum" due to the activities and the recreational opportunities available at the Park. Taken in this light, the placement of the Monument in Wicker Memorial Park may be considered private religious speech, which is protected under the Establishment Clause. Appleman bears the burden of no equal access, and has made no allegation that he has been denied access to the Park to erect a similar memorial or other type of monument or display. In fact, Appleman admits that "[t]he facilities at Wicker Park are generally available to the public and there are no restrictions on the use of facilities other than admission charges for some things." Statement of Facts, p. 3 in Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment (citing Defendants' answers to First Interrogatories 21 and 22).[9] There is no evidence that an atheist or other religious group could not erect their own war memorial disclaiming affiliation with any or a particular religion. Under the Establishment Clause, the Township had an obligation to provide a forum for religious speech desired by the Knights of Columbus even if the Township had no equal access policy for Wicker Memorial Park.

*Attorney's Fees*

As Plaintiffs have not prevailed on their claim, they are not entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

CONCLUSION

Based on the aforementioned, the Plaintiffs' Motion for Partial Summary Judgment is hereby DENIED, Defendants' Motion for Summary Judgment is GRANTED, and Defendants' Motion to Strike is GRANTED IN PART and DENIED IN PART. Additionally, Plaintiffs, Rosemary Gonzales, Harry Levin, Melvin Schlesinger, and Richard Vanorman are hereby DISMISSED from this cause.

---

**9.** It is also evident that at the time of the Monument's erection, the Township would not bar access to erecting similar monuments. The Park's then Superintendent, Stephen Grabovac, stated, "We're not trying to favor anyone or suppress anyone else. We want to be fair to everyone. Any other religious group can erect a monument right next to it if it gets permission. We don't want to discriminate against anyone." Exhibit C, Attachment 2, in support of Plaintiff's Motion for Partial Summary Judgment (quoting *"No Discrimination" on Wicker Park Cross,* Hammond Times, October 13, 1955.)

APPENDIX A

APPENDIX B

* APPENDIX C

* APPENDIX D

* APPENDIX E

* APPENDIX F

* APPENDIX G

694

*APPENDIX H

*APPENDIX I

*APPENDIX J

*APPENDIX K

*APPENDIX L

* The photographs in Appendices C, D, E, F, G, H, I, J, K, and L were taken from the following locations, in such manner that the crucifix in the southeast corner of Wicker Memorial Park is perceivable on each said photograph to the extent visible from each such location:

 **Appendix C:** taken from the doorway of the south entrance to the Wicker Memorial Park Clubhouse, looking east;

**Appendix D:** taken from the front door of the miniature golf course building, to the east of the clubhouse, looking east;

**Appendix E:** taken from the sign on the first tee of the golf course, looking somewhat southeast;

Appendix F: taken from the east side of the Social Center Portico, looking southeast;

Appendix G: taken from immediately in front of the Wicker Park Pavilion on the western edge of Wicker Memorial Park, looking slightly southeast;

Appendix H: taken from the median strip between southbound and northbound Indianapolis Boulevard, from a location approximately 300 yards south of the intersection of Indianapolis Boulevard and Ridge Road, looking north;

Appendix I: taken from the northern most lane of westbound Ridge Road at a location approximately 300 yards east from the intersection of Ridge Road and Indianapolis Boulevard, looking west;

Appendix J: taken from the median strip between eastbound and westbound Ridge Road, from a point approximately 300 yards west of the intersection of Ridge Road and Indianapolis Boulevard, looking east;

Appendix K: taken from the west edge of the center of tennis court number 4 at the tennis courts in Wicker Memorial Park, the approximate mid-point of the tennis courts, looking east;

Appendix L: taken from the north side of the Wicker Memorial Park swimming pool, looking south.